MOORE, J., delivered the opinion of the court in which STRANCH, J., joined. GRIFFIN, J. (pp. 291-313), delivered a separate dissenting opinion.
OPINION
KAREN NELSON MOORE, Circuit Judge.
The Board of Commissioners in Jackson County, Michigan begins its monthly meetings with a prayer. Peter Bormuth, a resident of Jackson County, filed suit against the County asserting that this prayer practice violates the First Amendment’s Establishment Clause. The district court granted the County’s motion for summary judgment and denied Bormuth’s motion for summary judgment, and Bormuth now appeals. We hold that the district court erred in rejecting Bormuth’s argument that the prayer practice coerced residents to support and participate in the exercise of religion. Accordingly, we REVERSE the district court’s grant of summary judgment to the County and REMAND for entry of summary judgment in Bormuth’s favor and for further proceedings consistent with this opinion.
I. BACKGROUND
The facts in this case are not in dispute. The Jackson County Board of Commissioners has nine members, including a Chairman, who are elected by the people of Jackson County. In addition to overseeing other Jackson County bodies, the Board of Commissioners holds monthly meetings to address matters of local concern. Each meeting begins with a call to order, after which the Chairman directs those in attendance to “rise” and “assume a reverent position.” R. 10 (Am. Compl. ¶¶ 17, 19) (Page ID #64-65). Then one.of the Commissioners — all of whom are Christian — delivers a prayer. Id. ¶¶ 19-23 (Page ID #64-66). Immediately after the prayer, the Board of Commissioners invites residents, often children, to lead attendees in the Pledge of Allegiance. Id. ¶ 17 (Page ID #64). The Board of Commissioners’ meetings are open to the public and, for citizens who are unable to attend, are videotaped and posted on Jackson County’s website. Id. ¶ 16 (Page ID #64).
*270 Bormuth is a self-described Pagan and Animist. Id. ¶ 13 (Page ID #63). He believes in the “attribution of conscious life to objects in and phenomena of nature” and the “existence of spirits separable from bodies.” Id. (emphasis removed) (internal quotation marks omitted). Bormuth worships the Sun and the Moon, as well as ancestral spirits, but his “primary deity is the Mother Earth.” Id. He has written essays, poetry, and music on the subject. Id. Deeply concerned with environmental issues, Bormuth started attending the Board of Commissioners’ monthly meetings because he believed that the Gounty was releasing pollutants into a local river. Id.
In July 2013, Bormuth attended the Board of Commissioners’ meeting to speak about closing the Jackson County Resource Recovery Facility, the mass-burn waste combustor that he believed was polluting the local river. Id. ¶25 (Page ID #66-67). At the meeting, after the Chairman said “all rise,” one of the Commissioners gave the following prayer:
Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna [sic] give you all the thanks and all the praise for all that you do. Lord I wanna [sic] remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus’s name. Amen.
Id. ¶ 23 (Page ID #65-66). As a Pagan and an Animist, Bormuth was uncomfortable with the Commissioner’s prayer. Id. ¶24 (Page ID #66). He felt like he was being forced to participate in a religion to which he did not subscribe in order to bring a matter of concern to his local government. Id.
Bormuth attended the Board of Commissioners’ August 2013 meeting as well. Id. ¶ 28 (Page ID #68). A Commissioner opened the meeting with the following prayer:
Please rise. Please bow our heads. Our heavenly father we thank you for allowing us to gather here in your presence tonight. We ask that you watch over us and keep your guiding hand on our shoulder as we deliberate tonight. Please protect and watch over the men and women serving this great nation, whether at home or abroad, as well as our police officers and firefighters. In this we pray, in Jesus name, Amen.
Id. During the prayer, Bormuth was the only one in attendance who did not rise and bow his head. Id. ¶ 29 (Page ID #68). Bormuth felt isolated, and he worried that the Board of Commissioners would hold against him his decision to stay seated. Id.
On the agenda for the August 2013 meeting was whether Jackson County employees with concealed-weapons permits could carry handguns at work. Id. ¶ 30 (Page ID #68-69). Following a discussion of Second Amendment rights, the Board of Commissioners voted in favor of the County employees who wished to carry handguns at work. See id. During the public-comment period, Bormuth stood and addressed the Board of Commissioners, calling attention to what he believed was an equally important constitutional issue: First Amendment rights. Id. ¶ 31 (Page ID #69). Bormuth told the Commissioners that he. thought that the monthly prayers violated the Establishment Clause and criticized the Commissioners for selectively following the Bill of Rights. Id. While *271 Bormuth was speaking, one of the Commissioners “made faces expressing his disgust” and then turned his chair around, refusing to look at Bormuth while he spoke. Id. The Commissioner’s reaction “confírm[ed] [Bormuth’s] fear[]” that his refusal to join the prayers would prejudice the Board of Commissioners against him. Id. Bormuth filed suit against the County ten days later, alleging that the prayer practice violated the Establishment Clause. R. 1 (Compl.) (Page ID #1).
While Bormuth’s suit was pending before the district court, the Board of Commissioners nominated residents to the County’s new Solid Waste Planning Committee. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had applied to serve on the Solid Waste Planning Committee, and had three years of experience working on related issues, the Board of Commissioners did not nominate him. Id. Bormuth surmised that this had something to do with his suit against the County. Indeed, an article published shortly after Bormuth filed his federal complaint revealed the Commissioners’ disapproval of the suit, quoting one Commissioner as saying, “Bormuth 'is attacking us and, from my perspective, my Lord and savior Jesus Christ,’ ” and another Commissioner as remarking, “All this political correctness, after a while I get sick of it.” R. 14 (Pl. First Mot. for Summ. J., Ex. C) (Page ID #149). Bormuth filed an amended complaint addressing the Board of Commissioners’ decision not to nominate him to the Solid Waste Planning Committee. R. 10 (Am. Compl. ¶33) (Page ID #69). He again alleged that the County was violating the Establishment Clause and asked for declaratory and injunctive relief as well as nominal damages. Id. ¶¶37, 44-50 (Page ID #70-71, 83-84).
Bormuth moved for summary judgment a month later. R. 14 (Pl. First Mot. for Summ. J.) (Page ID #107). In response, the County asked the district court to hold the case in abeyance pending the Supreme Court’s decision in Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). R. 16 (Def. Resp. to Pl. First Mot. for Summ. J. at 18) (Page ID #173). The district court did not hold the case in abeyance, but it did not rule on the motion for summary judgment either, and in May 2014 the Supreme Court issued its decision in Town of Greece. The County filed a motion for summary judgment in light of the Court’s opinion. R. 25 (Def. Mot. for Summ. J.) (Page ID #244). The district court terminated Bormuth’s first motion for summary judgment and invited him to file a second motion for summary judgment addressing Town of Greece, which he did. R. 32 (Order Terminating Mot. at 1-2) (Page ID #430-31); R. 37 (Pl. Second Mot. for Summ. J.) (Page ID #509).
While the parties were briefing their motions for summary judgment, they were also embroiled in two discovery disputes. The first dispute involved Bormuth’s efforts to take depositions. Bormuth sent the County notices of his intent to depose the Commissioners, R. 24-2 (Notices of Deps.) (Page ID #226), in order to obtain “information relating to [Bormuth’s] activities regarding the Jackson County Resource Recovery Facility,” as well as information on the Board of Commissioners’ practice of opening meetings with prayer and on its use of children to lead the Pledge of Allegiance following the prayer, R. 24-3 (Pl. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The County filed a motion to quash, arguing that it had already provided Bormuth with all the information that it had on its practice of opening meetings with prayer and on its use of children to lead the Pledge of Allegiance, and that any information it had on Bormuth’s activities regarding the Jackson County Re *272 source Recovery Facility was immaterial. R. 24 (Mot. to Quash at 3-7) (Page ID #213-17). In response, Bormuth stated that he also wanted to uncover the Commissioners’ motives in delivering the prayers. R. 26 (Resp. to Mot. to Quash at 7) (Page ID #296). The County replied that the Commissioners’ motives were also immaterial. R. 28 (Reply re: Mot. to Quash at 1) (Page ID #306).
The second dispute involved Bormuth’s efforts to supplement the record. Bormuth sought to supplement the record with the text of a Commissioner’s October 2014 prayer, R. 42 (PI. First Mot. to Suppl. Record at 1) (Page ID #790), and with a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works, R. 52 (PI. Second Mot. to Suppl. Record at 1) (Page ID #932). The County objected to the first motion to supplement the record because the October 2014 prayer was similar to the prayers that Bormuth had included in his amended complaint. R. 43 (Resp. to PI. First Mot. to Suppl. Record at 1-2) (Page ID #801-02). The County did not respond to the second motion to supplement the record, which was filed just days before the Magistrate Judge issued a Report and Recommendation.
The Magistrate Judge considered the County’s motion to quash depositions first. Although not persuaded by the County’s arguments that the information Bormuth sought was immaterial, the Magistrate Judge granted the motion “because both sides ha[d] fully briefed their respective summary judgment motions and responses, and plaintiff ha[d] not indicated the need for any additional discovery.” R. 46 (Order Granting Mot. to Quash at 6) (Page ID #820). The Magistrate Judge addressed the parties’ motions for summary judgment in another order, recommending that the district court deny the County’s motion for summary judgment, grant Bor-muth’s motion for summary judgment because “the legislative prayer practice of the Jackson County Board of Commissioners violates the Establishment Clause,” and enjoin the Board of Commissioners from “utilizing its current prayer practice.” R. 50 (R. & R. at 39) (Page ID #914). Finally, the Magistrate Judge denied without prejudice Bormuth’s motions to supplement the record because the Magistrate Judge had already recommended that the district court grant summary judgment in Bormuth’s favor. R. 54 (Order Denying Mots, to Suppl. Record at 1) (Page ID #998).
The district court rejected the Magistrate Judge’s recommendations. Beginning with the motion to quash depositions, the district court agreed with the County that the information Bormuth sought in deposing the Commissioners — “information relating to [Bormuth’s] activities regarding the Jackson County Resource Recovery Facility,” R. 24-3 (PL Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236) — was not germane to the dispute, R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2-3) (Page ID #1045-46). Confusing the Jackson County Resource Recovery Facility with the Solid Waste Planning Committee (or possibly with the Board of Public Works), the district court explained that because Bormuth “ha[d] not brought an employment discrimination claim,” “information regarding the Jackson County Resource Recovery Facility’s failure to hire him ... is not relevant.” Id. The district court further stated that although Bor-muth also sought information on the Commissioners’ motives in giving the prayers, “motive is not a relevant factor.” Id. at 3 (Page ID #1046). The district court then granted Bormuth’s first motion to supplement the record with the Commissioner’s October 2014 prayer but denied Bormuth’s second motion to supplement the record *273 with the letter that he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 60 (Dist. Ct. Order Re: Mots, to Suppl. Record at 2-3) (Page ID #1048^49). Conflating Bormuth’s second motion to supplement the record with his efforts to depose the Commissioners, the district court described the second motion to supplement the record as seeking to introduce “[Bor-muth’s] application to a position on the Jackson County Resource Recovery Facility,” concluding that, “[bjecause [Bor-muth’s] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, his affidavit -describing the Board’s failure to hire him is irrelevant.” Id. at 3 (Page ID #1049) (emphasis removed).
The district court then turned to the merits of Bormuth’s Establishment Clause claim. The district court considered the content of the Board of Commissioners’ prayers first, and concluded that, although the prayers were “exclusively Christian,” they were composed of only “benign religious references” — making Bormuth’s reaction to them “hypersensitive.” R. 61 (Dist. Ct. Op. at 7-8) (Page ID #1057-58). “The fact that all nine of the Commissioners are Christian,” the district court stated, “is immaterial, [because] [a]s elected officials, they were chosen as representatives whose interests were most closely aligned with the public’s, and their personal beliefs are therefore a reflection of the community’s own overwhelmingly Christian demographic.” Id. at 7 (Page ID #1057). Turning to whether the Board of Commissioners’ practice was coercive, the district court noted that Bormuth could have left the room during the prayers, and that nothing in the record indicated that his absence would have been perceived as disrespectful. Id. at 12-13 (Page ID #1062-63). Accordingly, the district court held that “Bormuth’s subjective sense of affront resulting from exposure to sectarian prayer is insufficient to sustain an Establishment Clause violation.” Id. at 13 (Page ID #1063) (emphasis removed). Although the district court acknowledged that some citizens may not perceive statements such as “rise” and “assume a reverent position,” see, e.g., R. 10 (Am. Compl. ¶ 19) (Page ID #64-65), as the mere “voluntary invitations” that the district court believed they were, the district court did not discuss the point further, R. 61 (Dist. Ct. Op. at 13-14) (Page ID #1063-64). As for the Commissioners’ treatment of Bor-muth, the district court stated that, though “evidence of disrespect,” the Commissioners’ treatment by turning their backs to him “does not demonstrate that the Board was prejudiced against him because he declined to participate in the prayer — rather, their behavior is likely an unfortunate expression of their own personal sense of affront elicited by his sentiments.” Id. at 15 (Page ID #1065).
Bormuth timely appeals the district court’s order granting the motion to quash, its order denying the second motion to supplement the record, and its order granting the County’s motion for summary judgment and denying Bormuth’s motion for summary judgment. R. 65 (Notice of Appeal) (Page ID #1072).
II. ANALYSIS
A. Whether the District Court Abused its Discretion by Granting the Motion to Quash and Denying the Motion to Supplement the Record
This court reviews for an abuse of discretion both a district court’s ruling on a motion to quash and its ruling on a motion to supplement the record. Guy v. Lexington-Fayette Urban Cty. Gov’t, 624 Fed.Appx. 922, 928 (6th Cir. 2015) (motion *274 to quash); see Duha v. Agrium, Inc., 448 F.3d 867, 882 (6th Cir. 2006) (motion to supplement the record). “An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the -wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment.” Louzon v. Ford Motor Co., 718 F.3d 556, 560 (6th Cir. 2013) (internal quotation marks omitted).
In granting the County’s motion to quash the depositions of the Commissioners, the district court concluded that, because Bormuth “ha[d] not brought an employment discrimination claim,” “information regarding the Jackson County Resource Recovery Facility’s failure to hire him ... is not relevant.” R. 59 (Dist. Ct. Order Granting Mot. to Quash at 2-3) (Page ID #1045-46). This was a misapprehension of the facts. Bormuth had not sought information regarding the Jackson County Resource Recovery Facility’s failure to hire him. He had sought information about his efforts to close it: the Jackson County Resource Recovery Facility was the mass-burn waste combustor that Bor-muth believed was polluting the local river. R. 24-3 (PI. Corrected Rule 26(a)(1) Disclosures at 1) (Page ID #236). The district court also concluded that, to the extent Bormuth sought information on the Commissioners’ motives in giving the prayers, “motive is not a relevant factor.” R. 59 (Dist. Ct. Order Granting Mot. to Quash at 3) (Page ID #1046). This was a misapplication of the law. The Commissioners’ purpose in delivering the prayers is highly relevant, because legislative prayer that is intended to proselytize may violate the Establishment Clause by coercing citizens to support and participate in the exercise of religion. Town of Greece, 134 S.Ct. at 1825-26 (controlling opinion). The district court’s order, therefore, was an abuse of discretion.
In denying Bormuth’s second motion to supplement the record — which asked the district court to consider the letter that Bormuth received from the Board of Commissioners denying him appointment to .the Board of Public Works— the district court also misapprehended the facts and misapplied the law. The district court characterized Bormuth’s second motion to supplement the record as seeking to introduce “his application to a position on the Jackson County Resource Recovery Facility.” R. 60 (Dist. Ct. Order Re: Mots, to Suppl. Record at 3) (Page ID #1049). But as explained above, Bormuth never applied for a position at the Jackson County Resource Recovery Facility; he attempted to close it. His second motion to supplement the record concerned his application to the Board of Public Works. R. 52 (PL Second Mot. to Suppl. Record at 1) (Page ID #932). The district court then concluded that “[bjecause [Bormuth’s] complaint makes no employment discrimination claim, instead advancing as the sole cause of action an Establishment Clause violation, [the letter and] affidavit describing the Board’s failure to hire him [are] irrelevant.” R. 60 (Dist. Ct. Order Re: Mots, to Suppl. Record at 3) (Page ID #1049) (emphasis removed). But the letter and affidavit are relevant — they speak to whether the Board of Commissioners is allocating benefits and burdens based on citizens’ participation in the prayers, which is a critical part of the analysis of legislative-prayer claims. See Town of Greece, 134 S.Ct. at 1826 (controlling opinion). Accordingly, the district court’s order denying the motion to supplement the record was also an abuse of discretion. However, because we find that Bormuth is entitled to summary judgment as a matter of law on the record that was before the district *275 court, both of the district court’s errors are harmless.
B. Whether the Board of Commissioners’ Practice Violates the Establishment Clause
1. Framework
Before considering the merits of Bor-muth’s arguments, we must first set forth the framework within which to analyze his claim. Unfortunately, our sources are limited. There are only two Supreme Court eases that have considered the constitutionality of legislative prayer — Marsh v. Chambers and Town of Greece — and neither one provides much instruction beyond establishing that legislative-prayer claims occupy a unique place in First Amendment jurisprudence.
Marsh, the first Supreme Court case to, consider a legislative-prayer claim, bypassed the Court’s previously constructed tests for Establishment Clause violations, reasoning that because “the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom,” from “colonial times through the founding of the Republic and ever since,” those tests did not apply. 463 U.S. 783, 786, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). The Court held that a new formal test was unnecessary. As the Court explained, “[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an ‘establishment’ of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.” Id. at 792, 103 S.Ct. 3330; Although the Court still asked whether any features of the practice before it violated the' Establishment Clause, it evaluated the parties’ arguments “against the historical background” of legislative, prayer. Id. at 792-93, 103 S.Ct. 3330.
Town of Greece confirmed that “Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.” 134 S.Ct. at 1819. However, Town of Greece cautioned that “Marsh must not be understood as permitting a practice that would amount to a constitutional violation if riot for its historical foundation.” Id. “The case teaches instead that the Establishment Clause must be interpreted by reference to historical practices and understandings.” Id. (internal quotation marks omitted). Following the framework set forth in Marsh, the Court in Town of Greece considered whether the legislative prayer before it “fit[ ] within the tradition long followed in Congress and the state legislatures.” Id. Examining the prayer “against the backdrop of historical practice,” Town of Greece asked whether the prayer violated the Establishment Clause by either being sectarian, id. at 1820, or coercive, id. at 1825 (controlling opinion). The Court found that while sectarian prayers would not necessarily violate . the Establishment Clause, coercive prayer practices would. Id. at 1821, 1825.
Thus, we must determine whether the Board of Commissioners’ practice is similar to the practices upheld in Marsh and Town of Greece or if there are critical differences that bring the Board of Commissioners’ practice outside the ambit of historically tolerated legislative prayer. Legislative prayer may fall outside the bounds of the Establishment Clause if it strays too far from its traditional purpose and effect — respectful solemnification — or if it is unconstitutionally coercive. Id. at 1827 (courts should determine whether legislative prayers “comport with the tradition of solemn, respectful prayer approved in Marsh, or whether coercion is a *276 real and substantial likelihood”). Town of Greece provided several indicators of how a legislative prayer practice might stray from this traditional purpose, including patterns of proselytization, denigration, discrimination, or censorship of religious speech. Id. at 1821-24. Alternatively, a legislative prayer practice might be unconstitutionally coercived “if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826.
2. A Closer Look at Marsh and Town of Greece
Because we must compare the Board of Commissioners’ practice to the practices upheld in Marsh and Town of Greece in order to determine whether the Board of Commissioners’ practice also falls within the tradition of legislative prayer, a closer look at both cases is necessary.
a. Marsh
Marsh concerned the Nebraska Legislature’s practice of opening its sessions with a prayer delivered by a chaplain. 463 U.S. at 784, 103 S.Ct. 3330. Although the Nebraska Legislature could choose a new chaplain biennially, the same chaplain, a Presbyterian minister, had been giving the prayers for sixteen years. Id. at 784-85, 103 S.Ct. 3330. He was also paid with public funds. Id. The Supreme Court’s opinion provided little additional detail on the Nebraska Legislature’s practice, instead observing that “[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.” Id. at 786, 103 S.Ct. 3330. Indeed, Nebraska had adopted the practice before it had even achieved statehood. Id. at 789-90, 103 S.Ct. 3330. The Supreme Court concluded that the Nebraska practice fell within the scope of historically tolerated legislative prayer and that no features of the practice — including that the chaplain was paid with public funds — violated the Establishment Clause. Id. at 792-95, 103 S.Ct. 3330.
b. Town of Greece
Tovm of Greece provides more points of comparison. In 1999, the Town of Greece started opening its monthly town board meetings with prayers delivered by local clergy. 134 S.Ct. at 1816. Unlike in Marsh, the clergy were volunteers whom the town typically contacted through their local congregations. Id. Although the town never “excluded or denied an opportunity to a would-be prayer giver,” the town recruited exclusively Christian clergy for eight years. Id. Susan Galloway and Linda Stephens, residents of the Town of Greece, attended the monthly board meetings and objected to the prayers’ Christian content. Id. at 1817. In response, the town invited a Jewish layman and the chairman of the local Baha’i temple to offer invocations. Id. The town also accepted a request to deliver a prayer from a Wiccan priestess, who had read about the controversy in the news. Id.
Galloway and Stephens filed a complaint alleging that the town’s practice violated the Establishment Clause “by preferring Christians over other prayer givers and by sponsoring sectarian prayers, such as those given ‘in Jesus’ name.’ ” Id. (quoting Galloway v. Town of Greece, 732 F.Supp.2d 195, 203 (W.D.N.Y. 2010)). They did not, however, seek to enjoin the town’s practice in its entirety, “but rather requested an injunction that would limit the town to ‘inclusive and ecumenical’ prayers that referred only to a ‘generic God’ and would not associate the government with *277 any one faith or belief.” Id. (quoting Galloway, 732 F.Supp.2d at 210, 241). Galloway and Stephens believed “that the setting and conduct of the town board meetings create[d] social pressures that force[d] non-adherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsored] the prayer and ... vote[d] on matters citizens [brought] before the board.” Id. at 1820. They further argued that “[t]he sectarian content of the prayers compound[ed] the subtle coercive pressures ... because the nonbeliever who might tolerate ecumenical prayer [was] forced to do the same for prayer that might be inimical to his or her beliefs.” Id. The district court found no Establishment Clause violation, Galloway, 732 F.Supp.2d at 243, and the Second Circuit reversed, Galloway v. Town of Greece, 681 F.3d 20, 34 (2d Cir. 2012).
The Supreme Court reversed the Second Circuit in an opinion written by Justice Kennedy. The first half of Justice Kennedy’s opinion, which garnered a majority of the Court, held that Galloway and Stephens’s insistence on inclusive and ecumenical prayer was inconsistent with Marsh. Town of Greece, 134 S.Ct. at 1820-24. The Court explained that Marsh had held that the use of prayer to open legislative sessions was constitutional not because the prayer was nonsectarian, but because “prayer in this limited context could ‘coexist with the principles of disestablishment and religious freedom.’ ”[1] Id. at 1820 (alteration omitted) (quoting Marsh, 463 U.S. at 786, 103 S.Ct. 3330). Indeed, the Court noted that the prayers given by one of the Senate’s first chaplains were sectarian and warned that “[t]he decidedly Christian nature of these prayers must not be dismissed as the relic of a time when our Nation was less pluralistic than it is today.” Id.
The Court also expressed concern that Galloway and Stephens’s proposed cure would be worse than the disease:
To hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town’s current practice of neither editing or approving prayers in advance nor criticizing their content after the fact.
Id. at 1822. The Court was quick to note, however, that there were still constraints on the content of legislative prayer. Id. at 1823. These constraints came from the prayer’s purpose, which is to solemnize the legislative session. Id. If the prayer’s content strayed from this purpose, the prayer would no longer be consistent with the First Amendment. But “[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer [would] not likely establish a constitutional violation.”[2] Id. at 1824.
The second half of Justice Kennedy’s opinion, which was joined by only two oth *278 er Justices, considered Galloway and Stephens’s argument that the town’s practice was coercive — specifically, that it pressured members of the public to participate in the prayers in order to appease town board members. Id. at 1824-28 (controlling opinion). Justice Kennedy’s opinion agreed that this kind of pressure was problematic, stating that “[i]t is an elemental First Amendment principle that government may not coerce its citizens ‘to support or participate in any religion or its exercise.’ ” Id. at 1825 (quoting Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 659, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). However, the opinion Stated that there was no evidence of coercion in the record. The opinion explained that the inquiry into whether the government has engaged in such coercion is “a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. By “offering a brief, solemn, and respectful prayer to open its monthly meetings,” the Town of Greece had not “compelled its citizens to engage in a religious observance.” Id. “[Legislative prayer,” the opinion explained, “has become part of our heritage and tradition,” and “[i]t is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize.” Id. The opinion determined that there was nothing in the record about the setting of the prayer that undermined this presumption. Id. As for the principal audience to whom the prayer was directed, the opinion explained that it is presumed that the principal audience is the lawmakers themselves, because legislative prayer is “an internal act” in which government officials invoke the divine for their own benefit rather than to promote religion to the public. Id. (quoting Chambers v. Marsh, 504 F.Supp. 585, 588 (D. Neb. 1980)). Again, the opinion determined that there was nothing in the record about the principal audience that undermined this presumption. Id. at 1825-26.
The opinion then observed, importantly "for our purpose, that “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826. The opinion further noted that “[n]othing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined,” and finally, that “[i]n no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished.” Id.
Before we determine whether the Board of Commissioners’ practice falls within the bounds of historically tolerated legislative prayer, we must take a short detour. As noted above, the Court in Town of Greece was divided: although four Justices signed on to the first half of Justice Kennedy’s opinion, only two Justices signed on to the second half. Thus, while Justice Kennedy’s analysis of the respondents’ content-based argument garnered a majority of the Court, Justice Kennedy’s analysis of the respondents’ coercion argument did not. Complicating matters, Justice Thomas filed an opinion concurring in part and concurring in the judgment, which Justice Scalia joined, advancing a different theory as to the kind of coercion required to *279 violate the First Amendment’s Establishment Clause.
“When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.’ ” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Thus, we must determine whether Justice Kennedy’s or Justice Thomas’s conception of coercion constitutes the narrowest grounds.
Although the Supreme Court has applied the “narrowest grounds” rule a number of times, most extensively in Marks v. United States and Gregg v. Georgia, it has never actually defined the term. Accordingly, we undertook the task in United States v. Cundiff, which applied the “narrowest grounds” rule to Rapanos v. United States, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), in order to answer a jurisdictional question. Cundiff, 555 F.3d 200, 208-09 (6th Cir. 2009). After a detailed examination of Marks and Gregg, Cundiff held,
As these cases indicate — and contrary to assertions by the Cundiffs and their amici — Marks does not imply that the “narrowest” Rapanos opinion is whichever one restricts jurisdiction the most. But it also makes-little sense for the “narrowest” opinion to be the one that restricts jurisdiction the least, as the government’s amici allege; the ability to glean what substantive value judgments are buried within concurring, plurality, and single-Justice opinions would require something like divination to be performed accurately. Instead, “narrowest” opinion refers to the one which relies on the “least” doctrinally “far-reaching-common ground” among the Justices in the majority: it is the concurring opinion that offers the least change to the law.
Id. at 209 (internal citation omitted). An examination of Gregg and Marks confirms our understanding of the rule.[3]
Gregg interpreted the Supreme Court’s decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), where a majority of the Court held that Georgia’s death penalty was unconstitutional. See Gregg, 428 U.S. at 168-69, 96 S.Ct. 2909. The Furman Court, however, could not agree on a rationale. The five Justices in the majority all filed separate concurring opinions: Justices Douglas, Stewart, and White concluded that the death penalty was unconstitutional as applied; Justices Brennan and Marshall concluded it was per se unconstitutional. Gregg held that “[s]ince five Justices wrote separately in support of the judgments in Furman, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds — Mr. Justice Stewart and Mr. Justice White.”[4] Id. at 169 n.15, 96 S.Ct. 2909.
*280 Marks interpreted Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), a similarly fractured opinion which reversed a state court’s declaration that a book was obscene. Marks, 430 U.S. at 193, 97 S.Ct. 990. In order to determine which Memoirs opinion was based on the narrowest grounds, Marks broke Memoirs down into its constituent parts. Id. at 193-94, 97 S.Ct. 990. In Memoirs, Justice Brennan, joined by Chief Justice Warren and Justice Fortas, wrote the opinion reversing the state court, Justices Black and Stewart concurred in the reversal for reasons stated in prior dissenting opinions, and Justice Douglas wrote a separate opinion concurring in the judgment. Marks concluded that Justice Brennan’s plurality opinion represented the narrowest grounds. Id. Before Memoirs, the controlling opinion on obscenity defined “obscene material” as “material which deals with sex in a manner appealing to prurient interest.” Roth v. United States, 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Justice Brennan’s plurality opinion set forth a three-part test which incorporated this definition of obscenity. Marks, 430 U.S. at 193-94, 97 S.Ct. 990. The other Justices concurred based on their belief either that only hard-core pornography can be suppressed, or that the First Amendment provides an absolute shield against restrictions of obscene material. Id. Justice Brennan’s plurality opinion, therefore, “offer[ed] the least change to the law.” Cundiff, 555 F.3d at 209.
Reading Marks and Gregg with Cundiff, we are left with one question: which analysis of coercion in Town of Greece — Justice Kennedy’s or Justice Thomas’s — -“relies on the least doctrinally far-reaching-common ground among the Justices in the majority?” Cundiff, 555 F.3d at 209 (internal quotation marks omitted). The answer is Justice Kennedy’s analysis. Although Justice Thomas’s conception of coercion is more restrictive, Justice Kennedy’s conception of coercion “offers the least change to the law.” Id.
As discussed above, Justice Kennedy’s opinion in Town of Greece states that “[i]t is an elemental First Amendment principle that government may not coerce its citizens ‘to support or participate in any religion or its exercise,’ ” a quote the opinion draws from County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter. Town of Greece, 134 S.Ct. at 1825 (controlling opinion) (quoting Cty. of Allegheny, 492 U.S. at 659, 109 S.Ct. 3086 (Kennedy, J., concurring in judgment in part and dissenting in part)). Justice Kennedy’s opinion further supports this statement with a citation to the plurality opinion in Van Orden v. Perry, where the Supreme Court held that “institutions must not press religious observances upon their citizens.” Id. (quoting Van Orden, 545 U.S. 677, 683, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005)). After finding no coercion in the record, Justice Kennedy’s opinion observes that “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826. Thus, Justice Kennedy’s opinion leaves the door open to coercion-based challenges to legislative prayer based on context and setting.
*281 Justice Thomas’s opinion concurring in part and concurring in the judgment states that “the municipal prayers at issue in this case bear no resemblance to the coercive state establishments that existed at the founding.” Id. at 1837. Justice Thomas’s opinion continues: “The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty.” Id. (emphasis in original) (quoting Lee v. Weisman, 505 U.S. 577, 640, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting)). The remainder of Justice Thomas’s opinion cites only Justice Thomas’s previous concurrences from cases where there were controlling majority or plurality opinions. Id. at 1837-38. Whatever the merits of Justice Thomas’s arguments, he does not cite .any controlling law to support them. Indeed, in his opinion concurring in the judgment in Elk Grove Unified School District v. Newdow, Justice Thomas criticizes the Supreme Court’s concern with “subtle coercive pressure” in the Establishment Clause context, acknowledging that the Court has not accepted his conception of the kind of coercion required to violate the Establishment Clause. 542 U.S. 1, 45-46, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (Thomas, J., concurring in the judgment) (quoting Lee, 505 U.S. at 592, 112 S.Ct. 2649).
Admittedly, the precise role of coercion in an Establishment Clause inquiry is unclear, especially within the context of legislative prayer. In that sense, both Justice Kennedy’s and Justice Thomas’s opinions involve at least some departure from the state of the law as it existed before Town of Greece. However, given that there is controlling precedent supporting Justice Kennedy’s opinion and no controlling precedent supporting Justice Thomas’s concurrence, Justice Thomas’s concurrence is neither the “the least doctrinally far-reaeh-ing-common ground among the Justices in the majority,” nor the “opinion that offers the least change to the law.” Cundiff, 555 F.3d at 209 (internal quotation marks omitted). What is more, when viewed within the context of the majority’s holding, Justice Kennedy’s opinion clearly represents the narrowest grounds. The majority’s holding was that there was no coercion. According to Justice Kennedy, this was because there was no coercion in the record. According to Justice Thomas, this was because there could never be coercion absent formal legal compulsion. Within the context of a ruling against the respondents, therefore, the narrower opinion is Justice Kennedy’s, not Justice Thomas’s. Accordingly, Justice Kennedy’s conception of coercion is the holding of the Court under binding Sixth Circuit precedent.
3. Whether the Board of Commissioners’ Practice Falls Within the Tradition of Legislative Prayer
We now turn to whether the Board of Commissioners’ practice falls within the tradition of legislative prayer. It does not. A combination of factors distinguishes this case from the practice upheld in Marsh and Town of Greece, including one important factor: the identity of the prayer giver. In Marsh, the Nebraska legislature opened its session with a prayer offered by a chaplain, 463 U.S. at 784, 103 S.Ct. 3330; in Town of Greece, invited clergy and laypersons delivered the invocations, 134 S.Ct. at 1816-17. Here, the Jackson County Commissioners give the prayers. See R. 10 (Am. Compl. ¶¶ 19-23) (Page ID #64-66). The difference is not superficial. When the Board of Commissioners opens its monthly meetings with prayers, there is no distinction between the government and the prayer giver: they are one and the same. The prayers, in Bormuth’s words, are literally “govern *282 mental speech.”[5] R. 29 (PI. Resp. to Def. Mot. for Summ. J. at 1) (Page ID #318).
Legislator-led prayer at the local level falls far afield of the historical tradition upheld in Marsh and Town of Greece. The setting of the prayer practice by the Jackson County Board of Commissioners — a local governing body with constituent petitioners in the audience — amplifies the importance of the identity of the prayer giver in our analysis, and heightens the risks of coercion, as borne out by the facts in this case. See infra at 291-92 [¶¶ 68-69]; see also Town of Greece, 134 S.Ct. at 1826 (distinguishing solicitations to pray by guest ministers from those by town leaders, noting that “[t]he analysis would be different if town board members” themselves engaged in the same actions).
а. Whether the Board of Commissioners’ Practice Strays from the Traditional Purpose and Effect of Legislative Prayer: Respectful So-lemnification
The identity of the prayer giver distinguishes the Board of Commissioners’ practice from the practices upheld in Marsh and Town of Greece and leads to other problems with the Board of Commissioners’ practice. Because they are the ones delivering the prayers, the Commissioners — and only the Commissioners — are responsible for the prayers’ content. See id. And because that content is exclusively Christian, by delivering the prayers, the Commissioners are effectively endorsing a specific religion.[6]
There are no opportunities for persons of other faiths to counteract this- endorsement by offering invocations. In Town of Greece, the Supreme Court upheld the town’s prayer practice in large part because it included prayers representing a variety of faiths. Although initially all of the prayer givers were Christian ministers, eventually the town invited a Jewish layman and the chairman of the local Baha’i temple to deliver invocations. See Town of Greece, 134 S.Ct. at 1817. When a Wiccan priestess asked for an opportunity to deliver the invocation, the town granted her request. Id. The Supreme Court emphasized that, “The town made reasonable efforts to identify all of the congregations *283 located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one.” Town of Greece, 134 S.Ct. at 1824; see also id. at 1829 (Alito, J., concurring) (“[T]he town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation.... The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths.”). In Jackson County, there is no opportunity for members of other faiths to offer invocations. Instead, there are exclusively Christian prayer givers and a pattern of explicitly Christian prayers.
What is more, the prayer givers are exclusively Christian because of an intentional decision by the Board of Commissioners. Unlike in Town of Greece, where the Court found no evidence of sectarian motive in the selection of speakers, at least one Jackson County Commissioner admitted that, in order to control the prayers’ content,' he did not want to invite the public to give prayers. At a November 2013 meeting of the Personnel & Finance Committee, one of the Commissioners imagined what would happen if any Jackson County resident could lead the prayer:
We all know that any one of us could go online and become an ordained minister in about ten minutes. Um, so if somebody from the public wants to come before us and say that they are an ordained minister we are going to have to allow them as well.
County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (37:47-38:01).[7] He continued:
And I think we are opening a Pandora’s Box here because you are going to get members of the public who are going to come up at public comment-and we are going to create a lot of problems here when certain people come up here and say things that they are not going to like.
Id. at 38:02-38:16. These comments reveal that the Board of Commissioners’ control over the content of the prayers is not just *284 a function of the Commissioners’ role as prayer givers — it is the result of an affirmative decision by the Commissioners to exclude other prayer givers.[8] The Board of Commissioners, in other words, is limiting who can give the prayers in order to control the prayers’ content.[9] And the effect is preventing participation by religious minorities and endorsing a specific religion. This brings the County’s use of prayer to open its monthly meetings well outside the ambit of historically tolerated legislative prayer.
Amicus offers another way in which the Board of Commissioners’ practice differs from previously upheld practices: its purpose is to promote religion to the public. The Supreme Court found that the prayers in Town of Greece were “intended to place town board members in a solemn and deliberative frame of mind,” 134 S.Ct. at 1816, and that this was in line with historical practice, as the purpose of legislative prayer is to “accommodate the spiritual needs of lawmakers,” id. at 1826 (controlling opinion). Amicus contends, however, that the Jackson County Commissioners cannot claim that their prayers are purely “an internal act.” Id. at 1825 (quoting Chambers, 504 F.Supp. at 588). According to Amicus, “[t]he only meeting of the full Board of Commissioners during the past two years when no prayer was offered was the meeting that no members of the public attended.” Amicus Br. at 12 (citing County of Jackson, November 6, 2014 Special Jackson County Board of Commissioners Meeting Video, YouTube (Nov. 7, 2014), http://tinyurl.com/2014nov6 (0:01-0:47)). Thus, although Town of Greece stated that prayer should not be used “to afford government an opportunity to proselytize or force truant constituents into the pews,” 134 S.Ct. at 1825 (controlling opinion), Amicus insists that the County is doing exactly that: “when members of the public are present, it preaches to them and directs them to participate; when only the Commissioners are present, they omit the prayer entirely,” Amicus Br. at 13.
Bormuth has waived this argument, and Amicus cannot make it for him. *285 “While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties.” Self-Ins. Inst. of Am., Inc. v. Snyder, 827 F.3d 549, 560 (6th Cir. 2016) (alteration omitted) (quoting Cellnet Commc’ns, Inc. v. FCC, 149 F.3d 429, 443 (6th Cir. 1998)), cert. denied, — U.S. —, 137 S.Ct. 660, 196 L.Ed.2d 524, 2017 WL 69264 (U.S. Jan. 9, 2017) (No. 16-593). Although Bormuth argued both that the Board of Commissioners’ practice “has the effect of proselytizing ... and advancing the Christian religion,” R. 10 (Am. Compl. at 19) (Page ID #78), and that the prayers-were “directed at the audience,” R. 29 (PL Resp. to Def. Mot. for Summ. J. at 14) (Page ID #331), he did not explicitly argue that the Commissioners’ purpose was to promote religion to the public. And although we are mindful of our rule that pro se filings should be construed liberally, Spotts v. United States, 429 F.3d 248, 250 (6th Cir. 2005), we decline to ground our analysis in Amicus’s argument.
We hold that the Board of Commissioners’ practice strays from the traditional purpose an'd effect of legislative prayer. A confluence of factors distinguishes the Jackson County practice from the practices upheld in Marsh and Town of Greece. These factors include the deliverance of the invocations by the Commissioners themselves in a local setting with constituent petitioners in the audience, as well as the Board’s intentional decision to exclude other prayer givers in order to control the content of the prayers. We now consider, as a second “independent but mutually reinforcing reason[ ]” why the prayer practice here falls outside the protective umbrella of tradition, whether the Board of Commissioners’ practice is coercive. Town of Greece, 134 S.Ct. at 1820. And as stated above, we proceed with the understanding that Justice Kennedy’s conception of coercion is controlling.
b. Whether the Board of Commissioners’ Practice Is Unconstitutionally Coercive
As the controlling opinion of the Court held in Town of Greece, “[i]t is an elemental First Amendment principle that government may not coerce its citizens ‘to support or participate in any religion or its exercise.’ ” Id. at 1825 (quoting Cty. of Allegheny, 492 U.S. at 659, 109 S.Ct. 3086 (Kennedy, J., concurring in judgment in part and dissenting in part)). The inquiry into whether the government has violated this principle is “a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. Although the Court in Town of Greece concluded that there was no evidence of coercion in the record before it, it held that “[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.” Id. at 1826. All three elements are present here.
First, the Board of Commissioners directs the public to participate in the prayers at every monthly meeting. As the Supreme Court has observed, the source of these statements is significant. In Town of Greece, “board members themselves stood, bowed their heads, or made the sign of the cross during the prayer,” but “they at no point solicited similar gestures by the public.” Id. (emphasis added). Rather, it was the clergy who asked audience members to participate in the prayer. Id. The Supreme Court reasoned that, because this direction came from the clergy, it was inclusive, not coercive. Id. Here, it is the Board of Commissioners, and the Board of Commission *286 ers only, that tells the public to join in the prayer. What is more, these instructions are almost always from the Chairman. See, e.g., R. 10 (Am. Compl. ¶¶ 19-23) (Page ID #64-66). The Chairman presides over the meeting; his words are cloaked in procedural formality. The words “rise” and “assume a reverent position” from the Chairman, therefore, are not mere suggestions, they are commands. But even in the infrequent instances where it is the Commissioner giving the prayer who tells the public to “rise” or to “bow [their] head[s],” R. 29-1 (PI. Resp. to Def. Mot. for Summ. J., Ex. E ¶¶ 9, 13, 22) (Page ID #370-71), the effect is the same: to coerce the public to participate in the exercise of religion.
This coercion is compounded by the setting in which it is exerted. See Town of Greece, 134 S.Ct. at 1825 (controlling opinion). Local government meetings are small and intimate. And unlike in federal and state legislative sessions, where the' public does not speak to the legislative body except by invitation, citizens attend local government meetings to address issues immediately affecting their lives. Indeed, as Amicus notes, Jackson County residents have gone to the Board of Commissioners’ monthly meetings to ask for funding for disabled students’ transportation to school, County of Jackson, June 18, 2013 Jackson County Board of Commissioners Meeting, YouTube (Jun. 19, 2013), http://tinyurl. com/2013junl9 (35:53-38:30), request repairs to roads leading to their homes or businesses, County of Jackson, July 23, 2013 Jackson County Board of Commissioners Meeting, YouTube (Jul. 24, 2013), http://tinyurl.com/2015jul23 (24:58-30:19), and redress discrimination, County of Jackson, March 17, 2015 Jackson County Board of Commissioners Meeting, YouTube (Mar. 18, 2015), http://tinyurl.com/ 2015marl7c (5:27 — 7:42). Thus, there is increased pressure on Jackson County residents to follow the Board of Commissioners’ instructions at these meetings, as the residents would not want to offend the local government officials they are petitioning.
Second, the Board of Commissioners has singled out Bormuth for opprobrium. During a public meeting, a Commissioner stated that Bormuth’s lawsuit was an “attack on Christianity and Jesus Christ, period.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov12 (32:50-32:59). Another Commissioner characterized Bor-muth’s lawsuit as “political correctness nonsense” and complained that he has “had political' correctness jammed down [his] throat.” Id. at 43:00-43:18. That Commissioner continued:
The Federalist Papers, if you read them, tell[ ] me that it is your duty to disobey an illegal law. And it has taken some nitwit two hundred-and-some years to come up with an angle like this to try to deprive me or other people, of my faith, of my rights.
Id. at 43:22-43:41 (emphasis added). In disparaging Bormuth, the Board of Commissioners’ message is clear: residents who refuse to participate in the prayers are disfavored. Indeed, when Bormuth expressed his belief that the Board of Commissioners was violating the First Amendment during the public-comment period of the August 2013 meeting, one of the Commissioners made faces and then turned his back on Bormuth, refusing even to look at Bormuth while he spoke. R. 10 (Am. Compl. ¶ 31) (Page ID #69).
Third, Bormuth has submitted evidence suggesting that the Board of Commissioners has “allocated benefits and burdens based on participation in the prayer.” See Town of Greece, 134 S.Ct. at 1826 (controlling opinion). Shortly after Bormuth filed *287 his complaint, Jackson County officials nominated members for the County’s new Solid Waste Planning Committee from a pool of applicants. R. 10 (Am. Compl. ¶ 33) (Page ID #69). Although Bormuth had three years of experience working on related issues, the Board of Commissioners did not nominate him. Id. Given that the Commissioners had publicly expressed their contempt for Bormuth, id. ¶ 31 (Page ID #69); see also R. 14 (PI. First Mot. for Summ. J., Ex. C) (Page ID #149), the Board of Commissioners’ decision not to nominate him could easily be interpreted as a response to Bormuth’s refusal to participate in the prayers. Bormuth also sought to supplement the record with'a letter he received from the Board of Commissioners denying him appointment to the Board of Public Works. R. 52 (PI. Second Mot. to Suppl. Record at 1) (Page ID #932). Although Bormuth is confident that he was ‘the most qualified applicant,’ the Board of Commissioners did not name him for the position. Id. ¶ 6 (Page ID #933). This rejection came just shy of a month after one of the Commissioners publicly called Bormuth a “nitwit.” See County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013novl2 (43:22-43:41). Like the County’s decision not to nominate him to the Solid Waste Planning Committee, this decision suggests that the Board of Commissioners was denying benefits to residents based on their beliefs.
Two factual details about Jackson County’s prayer practice bear emphasis. First, the Jackson County Board of Commissioners affirmatively excluded non-Christian prayer givers, and did so in an effort to control the content of prayers. See County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http:// tinyurl.com/2013novl2 (37:47-38:16). Second, Commissioners attempted to silence Bormuth and insulted him for criticizing their prayer practice. For example, when Bormuth voiced his concern about the prayer practice at a meeting, a Commissioner turned his chair around, refusing to listen to him. R. 10 (Am. Compl. at ¶ 31) (Page ID #69). One Commissioner said that Bormuth was “attacking ... my Lord and savior Jesus Christ.” R. 14 (PI. First Mot. for Summ. J., Ex. C) (Page ID #149). Separately, a Commissioner referred to Bormuth as “a nitwit.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/ 2013nov12 (32:50-32:59, 43:00-43:18, 43:22-43:41). These facts show how far Jackson County’s practice strays from the historically tolerated tradition of legislative prayer. There is no question that factual details are relevant to the Establishment Clause inquiry. In Town of Greece, the Supreme Court made clear that its decision about the Town of Greece’s prayer practice did not absolve courts of the duty to evaluate the constitutionality of factually distinguishable prayer practices. “Courts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in Marsh, or whether coercion is a real and substantial likelihood.” Town of Greece, 134 S.Ct. at 1826-27. “If circumstances arise in which the pattern and practice of ceremonial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the regular course.” Id. at 1826; see also Marsh, 463 U.S. at 795, 103 S.Ct. 3330. Jackson County’s prayer practice gives rise to just those circumstances.
C. The Dissent’s Reliance on a Recent Fourth Circuit Case
The dissent contends that its “view as to the constitutionality of Jackson County’s *288 invocation practice is consistent with the Fourth Circuit’s recent opinion in Lund v. Rowan County.” Dissent at 300. ThFourth Circuit has granted rehearing en banc in Lund, undercutting the persuasive value of the now-questioned panel majority. Lund v. Rowan County, (No. 15-1519), — Fed.Appx. —, —, 2016 WL 6441047, at *1 (4th Cir. Oct. 31, 2016) (granting rehearing en banc). More importantly, regardless of the outcome of the en banc rehearing, the dissent’s reliance on Lund falls flat for two reasons: First, Judge Wilkinson’s panel dissent in Lund is much more convincing than the majority opinion (a view that a significant number of Fourth Circuit judges presumably share). Second, contrary to the dissent’s assertion that “Rowan County’s invocation practice is remarkably similar” to Jackson County’s practice, there are significant factual differences. Dissent at 311-12. Because of these differences, even if the Lund majority opinion were correct that the Rowan County prayer practice complies with the Establishment Clause, the Jackson County prayer practice still violates the Establishment Clause.
On the first point, the Lund dissent, which is much more convincing than the majority opinion, supports our conclusions in this case. Judge Wilkinson’s dissent explains, persuasively, that Town of Greece “in no way sought to dictate the outcome of every legislative prayer case. Nor did it suggest that ‘no constraints remain on [prayer] content.’” Lund v. Rowan Cty., 837 F.3d 407, 433 (4th Cir. 2016) (Wilkinson, J., dissenting) (quoting Town of Greece, 134 S.Ct. at 1823) (alterations in original). While Judge Wilkinson indicates that he “would not for a moment cast all legislator-led prayer as constitutionally suspect,” he also understands that, per Town of Greece, “[t]he Establishment Clause still cannot play host to prayers that ‘over time ... denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.’ ” Lund, 837 F.3d at 431 (Wilkinson, J., dissenting) (quoting Town of Greece, 134 S.Ct. at 1823). He acknowledges that, “[(legislator-led prayer, when combined with the other elements, poses a danger not present when ministers lead prayers. The Rowan County commissioners, when assembled in their regular public meetings, are the very embodiment of the state.” Lund, 837 F.3d at 434 (Wilkinson, J., dissenting). Accordingly, Judge Wilkinson determines that the Rowan County Board of Commissioners’ prayer practice is unconstitutional because the “combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceeds even a broad reading of Town of Greece.” Id. at 431.
Judge Wilkinson also rightly points out that there are many ways to solemnize a county board meeting without running afoul of the Establishment Clause. A county board “can solemnize its meetings without creating such tensions” by using “nondenominational prayers or diverse prayer-givers” or prefacing the prayer with a “Message of Religious Welcome” emphasizing that members of all religions (or no religion) are welcome in the meeting and community. Id. at 437-38. “Such an expression of religious freedom and inclusion would promote the core idea behind legislative prayer, ‘that people of many faiths may be united in a community of tolerance and devotion.’ ” Id. at 438 (quoting Town of Greece, 134 S.Ct. at 1823).
The combination of factors that, according to Judge Wilkinson, renders the Rowan County Board’s prayer practice unconstitutional also exists in Jackson County (and Jackson County’s practice included additional factors that make it even more *289 constitutionally suspect, as discussed below). Additionally, Judge Wilkinson’s observation that a county can easily solemnize county board meetings and comply with the Establishment Clause is as true in Jackson County as in Rowan County.
On the second point, the prayer practice that we confront in this case presents even more constitutionally suspect factors than the prayer practice that the Fourth Circuit confronted in Lund. The factual distinctions are important because “[t]he [Establishment Clause] inquiry remains a fact-sensitive one.” Town of Greece, 134 S.Ct. at 1825. To structure this fact-sensitive inquiry, the Lund panel majority focuses on four “guideposts for analyzing whether a particular practice goes beyond constitutional bounds.” Lund, 837 F.3d at 420. Examining the facts of this case through those four guideposts shows that even if the Lund majority is correct that the Rowan County prayer practice complies with the Establishment Clause, the Jackson County prayer practice nevertheless violates the Establishment Clause.
Addressing the first panel guidepost, “selection of the content of legislative prayer,” the Lund majority explains that it is important to “look[ ] to the activities of the legislature as a whole in considering legislative prayer.” Id. at 421. The Lund majority determines that the Rowan County Board “never altered its practice to limit a non-Christian commissioner or attempted to silence prayers of any viewpoint.” Id. at 424. Based on this determination, the Lund majority concluded that, “[t]he Board’s practice here, where each commissioner gives their own prayer without oversight, input, or direction by the Board simply does not present the same concerns of the ‘government [attempting] to define permissible categories of religious speech.’ ” Id. at 420 (quoting Town of Greece, 134 S.Ct. at 1822) (emphasis and second alteration in original). Even if this assessment is correct, there is a difference between the actions of the Rowan County Board and those of the Jackson County Board: Unlike the Rowan County Board, the Jackson County Board, as a governing body, did affirmatively exclude other prayer givers in order to control the content of the prayers. See County of Jackson, Personnel & Finance Committee November 12, 201S Jackson County, MI, YouTube (Dec. 19, 2013), http://tinyurl.com/2013nov 12 (37:47-38:16). By excluding other prayer givers to control the content of prayers, the Jackson County Board was exercising “oversight” and “‘[attempting] to define permissible categories of religious speech.’ ” Lund, 837 F.3d at 420 (quoting Town of Greece, 134 S.Ct. at 1822) (alteration in original).
In addition, the Jackson County Board of Commissioners attempted to silence Bormuth’s criticism of the prayer practice, insulting Bormuth in the process. When Bormuth complained about the prayer practice at a meeting, one of the Commissioners made a disgusted face and turned his chair around, refusing to look at Bor-muth while he spoke. R. 10 (Am. Compl. at ¶ 31) (Page ID #69). Later, discussing Bormuth’s complaints about the prayer practice, a Commissioner said that he “get[s] sick of’ “[a]ll this political correctness” and another said that Bormuth was “attacking .., my Lord and savior Jesus Christ.” R. 14 (PI. First Mot. for Summ. J., Ex. C) (Page ID #149). Accordingly, the Board not only purposefully excluded non-Christian prayer, but also insulted and attempted to silence Bormuth’s complaints about their exclusionary prayer practice.
The Jackson County Board of Commissioners’ affirmative decision to exclude other prayer givers also requires us to consider the second Lund panel majority guidepost, the content of the prayers, in a *290 different light. Addressing the second guidepost, the Lund majority explains, “ ‘If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion,’ a constitutional line can be crossed.” Lund, 837 F.3d at 421 (quoting Town of Greece, 134 S.Ct. at 1823). Considering the content of the prayers over time, we must be mindful of the difference between unthinkingly failing to include non-Christian prayer, as the Rowan County Board apparently did, and intentionally excluding non-Christian prayer, as the Jackson County Board did. Unthinkingly excluding non-Christian prayer does not necessarily equate to denigrating other religions. The Jackson County Commissioners’ affirmative decision to exclude other prayer givers to ensure that any sectarian content would be Christian, on the other hand, does denigrate other religions. Affirmative exclusion communicates that non-Christian prayers are not welcome, which communicates that non-Christians are not welcome. Affirmative exclusion also communicates that only Christian prayers are adequate to solemnize county board meetings, which communicates that other prayers are inferior. Indicating that only Christians are welcome and that qther prayers are inferior denigrates other religions.
• The Jackson County Board of Commissioners’ affirmative decision to exclude other prayer givers is also relevant to the third Lund panel majority guidepost, “the selection of the prayer-giver.” Lund, 837 F.3d at 423. The Lund majority notes that in Town of Greece, the Supreme Court upheld the town’s practice because the town “ ‘represented that it would welcome a prayer by any minister or layman who wished to give one,’-” which indicated that the town “ ‘maintained] a policy of nondiscrimination.’ ” Id. (quoting Town of Greece, 134 S.Ct. at 1824). Even if the Rowan County Board’s decision to allow only Commissioners to give prayers can somehow be characterized as “ ‘a policy of nondiscrimination,’ ” the Jackson County Board did discriminate. Lund, 837 F.3d at 423 (quoting Town of Greece, 134 S.Ct. at 1824). To exclude prayers that Jackson County Commissioners did not want to hear, the Board of Commissioners forbade anyone but Commissioners from giving prayers. Excluding unwanted prayers is not a policy of nondiscrimination. Excluding unwanted prayers is discrimination.
Finally, the Jackson County Board of Commissioners’ affirmative decision to exclude other prayer givers is also significant when considering the fourth Lund guidepost, whether “ ‘over time’ ” “ ‘the prayer practice’ ” was “ ‘exploited to ... advance any one ... faith or belief.’ ” Lund, 837 F.3d at 424 (quoting Town of Greece, 134 S.Ct. at 1823) (alterations in original). Thé Jackson County Board of Commissioners’ affirmative exclusion of non-Christian prayers puts one faith, Christianity, in a privileged position. -It ensures that only Christians will hear prayers that speak to their religious beliefs at Board of Commissioners meetings. Worse, it ensures, that only Christians will hear prayers that speak to their religious beliefs because the government has singled out Christian prayer as uniquely able to solemnize these meetings. The affirmative exclusion thus advances one faith over others.
The Lund panel majority also concludes that Rowan County’s prayer practice is not coercive. The Lund panel majority focuses on whether the Board “ ‘directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity.’ ” Lund, 837 F.3d at 427 (quoting Town of Greece, 134 S.Ct. at 1826). Here again, factual distinctions between *291 this case and Lund mean that even if the Lund majority is correct that the Rowan County Board of Commissioners’ prayer practice is not coercive, the Jackson County Board of Commissioners’ prayer practice is coercive.
Although both Boards of Commissioners directed the public to participate in prayers, there is no evidence that the Rowan County Board of Commissioners singled out dissidents for opprobrium or allowed their decisions to be influenced by a constituent’s acquiescence (or refusal to acquiesce) to the prayer opportunity. The Jackson County Commissioners, on the other hand, did single out Bormuth for opprobrium. Commissioners stated that Bormuth’s lawsuit was “nonsense” and “an attack on Christianity and Jesus Christ, period” and called Bormuth a “nitwit” who was “try[ing] to deprive me or other people, of my faith, of my rights.” County of Jackson, Personnel & Finance Committee November 12, 2013 Jackson County, MI, YouTube .(Dec. 19, 2013), http://tinyurl. com/2013novl2 (32:50-32:59, 43:00-43:18, 43:22-43:41). There is also evidence that some of Jackson County Commissioners’ official decisions were influenced by Bor-muth’s refusal to acquiesce to the prayer opportunity. They denied Bormuth a nomination for the Solid Waste Planning Committee and, less than a month after a Commissioner publicly called him a nitwit, denied him an appointment to the Board of Public Works. R. 10 (Am. Compl. at ¶ 33) (Page ID #69); R. 52 (PI. Second Mot. to Suppl. Record at 1) (Page ID #932).
The distinctions between the actions of the Jackson County Board of Commissioners in the case before us and the actions of the Rowan County Board of Commissioners in Lund are significant. Because of these distinctions, even if the panel majority’s opinion in Lund is correct, it does not influence our assessment of the facts before us in this “fact-sensitive” inquiry. Town of Greece, 134 S.Ct. at 1825.
Accordingly, we hold that the Board of Commissioners’ use of prayer to begin its monthly meetings violates the First Amendment’s Establishment Clause. The prayer practice is well outside the tradition of historically tolerated prayer, and it coerces Jackson County residents to support and participate in the exercise of religion.[10]
III. CONCLUSION
For the reasons stated above, we REVERSE the grant of summary judgment to the County and REMAND for entry of summary judgment in favor of Bormuth and for further proceedings consistent with this opinion.

. The Court also repudiated dicta in County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter characterizing Marsh as proscribing sectarian prayer. Town of Greece, 134 S.Ct. at 1821-22.

. Because this is one of the Court's more concrete statements, it is tempting to turn it into a test and apply it to the County's prayer practice, as the County endeavors to do in its brief. See Appellee Br. at 23, 25. The Court's statement, however, must be viewed through the lens of Galloway and Stephens's insistence that legislative prayers be ecumenical. In other words, the statement is limited to challenges based on content alone.

. In Cundiff, we acknowledged that the “narrowest grounds” rule is only “workable” where “one opinion can be meaningfully regarded as 'narrower' than another.” Cundiff, 555 F.3d at 209 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Here, the rule can be applied without too much difficulty.

. Although Justice Douglas also concluded that the death penalty was unconstitutional as applied, he described the discretionary statutes at issue as "pregnant with discrimination.” Furman, 408 U.S. at 256-57, 92 S.Ct. 2726 (Douglas, J., concurring). Justice Stewart's discussion of race was moré measured: “My concurring Brothers have demonstrated *280 that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. But racial discrimination has not been proved, and I put it to one side.” Id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring) (footnotes omitted) (internal citations omitted). Justice White did not address race in his opinion. Id. at 310-14, 92 S.Ct. 2726 (White, J., concurring).

. The dissent says that it does not matter that the prayers are literally government speech because "[a] public official need not be the one giving a prayer in order for the Establishment Clause to apply.” Dissent at 302. In support of that statement, the dissent cites Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). Pleasant Grove City is about the Free Speech Clause, not the Establishment Clause; in fact, it specifically distinguishes the Establishment Clause. See id. at 467-68, 129 S.Ct. 1125. More importantly, nothing in Pleasant Grove City, nor in any cases about the Establishment Clause, changes the fact that the identity of the prayer giver is a relevant consideration in the highly "fact-sensitive” Establishment Clause inquiry. See Town of Greece, 134 S.Ct. at 1825.

. The dissent argues that whether the Commissioners endorse a particular religion is irrelevant because the Lemon test does not apply to this case. Dissent at 300-01. While we agree that we do not need to apply the Lemon test in this case, we disagree that whether the Commissioners’ prayer practice endorses one religion over others is entirely irrelevant. Town of Greece indicates that “Marsh must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation” and that "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.” 134 S.Ct. at 1819, 1823. Endorsing a specific religion can be part of a pattern of denigrating religious minorities or preaching conversion.

. This video, like the other videos we cite in our opinion, was part of the record before the district court. See R. 10 (Am. Compl. ¶ 16) (Page ID #64) (informing the district court that the County records the Board of Commissioners’ meetings and posts the videos on the County’s website); R. 29 (PL Resp. to Def. Mot. for Summ. J. at 11-16) (Page ID #328-33) (reciting what happened at several Board of Commissioners' meetings, videos of which the County posts online); R. 37-1 (PL Mot. for Summ. J., Ex. J) (Page ID #611-614) (including transcripts of three Board of Commissipn-ers’ meetings and stating that the County posts videos of Board of Commissioners’ meetings online). Indeed, as counsel for the County stated at oral argument, the "official record” includes all of the videos of the Board of Commissioners’ meetings. Despite the fact that Bormuth repeatedly references the videos and recites what happened at Board of Commissioners' meetings in his pleadings, the dissent contends that these videos are not part of the record. For that proposition, it cites United States v. Crumpton, 824 F.3d 593 (6th Cir. 2016). In Crumpton, the defendant ”refer[red] to a video of the execution of the search warrant[.] ... The video was not made part of the district court’s electronic record, however, nor was it forwarded to this court for purposes of appeal. Because the video has not been made part of the record before us, we cannot evaluate its effect on the case.” Id. at 614 n.6 (emphasis added). There is an obvious distinction between Crumpton and this case: In Crumpton, we determined that we could not evaluate the video’s effect because we did not have access to the video. That determination is entirely distinct from the one we are making here, which is that the parties have made the videos, which we can access, part of the record by repeatedly referencing them in pleadings.

. The dissent cautions against "examining the minds of individual legislators as it relates to legislative intent” and advocates "heed[ing] the Supreme Court's admonition that ‘[[Inquiries into [legislative] motives or purposes are a hazardous matter.’ " Dissent at 303. Presumably the dissent is not arguing that legislative purpose and motive are irrelevant. "Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country, and governmental purpose is a key element of a good deal of constitutional doctrine.” McCreary Cty. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 861, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (citation omitted). More likely, the dissent is arguing against relying too much on mere inferences about the motives of individual legislators. Here, we need not rely on inferences because there are clear statements expressing the desire to control the content of prayers. Moreover, McCreary, which the dissent relies on for support, indicates that "scrutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter’s heart of hearts.” 545 U.S. at 862, 125 S.Ct. 2722. No psychoanalysis is necessary in this case because there are discoverable facts in the form of clear statements and actions that reveal the Commissioners' motives.

. The dissent argues that, "Noticeably absent from the majority’s opinion is any acknowl-edgement that Jackson County’s invocation practice is facially neutral regarding religion” even though "[n]either other Commissioners, nor the Commission as a whole, review or approve the content of the invocations.” Dissent at 300. This acknowledgement is absent from our opinion because, as the affirmative decision to exclude other prayer givers makes plain, Jackson County's invocation practice purposefully discriminated against non-Christian prayer givers.

. Bormuth's remaining arguments, including that the panel must apply the three-part test of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as well as the Treaty of Tripoli (a 1797 treaty with Trip-olitania (now Libya) which states that "the Government of the United States of America is not, in any sense, founded on the Christian religion”) are meritless. Bormuth also does not have standing to assert an Establishment Clause violation on behalf of the children who lead attendees in the Pledge of Allegiance. See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 489-90, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).