GRIFFIN, J., delivered the opinion of the court in which BATCHELDER, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, KETHLEDGE, and THAPAR, joined. ROGERS, J. (pp. 519-21), delivered a separhte concurring opinion in which COOK and McKEAGUE, JJ., joined. SUTTON, J. (pp. 521-25), delivered a separate concurring opinion in which BATCHELDER, McKEAGUE, ' KETHLEDGE, and THAPAR, JJ., joined. MOORE, J. (pp. 525-45), delivered a separate dissenting opinion in which COLE, C.J., and' CLAY, STRANCH, and DONALD, JJ., joined; and WHITE, J., joined in part. WHITE, J. (pp,545-546), delivered a separate dissenting opinion.
OPINION
GRIFFIN, Circuit Judge.
Since the founding of our Republic; Congress,, state legislatures, and many municipal bodies have commenced legislative sessions with a prayer. Consonant with this historical practice, defendant Jackson County Board of Commissioners opens its public meetings with a prayer that is gen *498 erally solemn, respectful, and reflective. Plaintiff Peter Bormuth claims that this custom violates the Establishment Clause of the United States Constitution[1] because the Commissioners themselves offer the invocations. We disagree and affirm the judgment of the district court.
In doing so, we hold that Jackson County’s invocation practice is consistent with the Supreme Court’s legislative prayer decisions, Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014), and does not violate the Establishment Clause.
I.
A.
The Jackson County Board of Commissioners is an elected board of nine individuals that represents the citizens of Jackson County, Michigan. The Board opens its monthly meetings with Commissioner-led prayers. Following a call to order, the Board’s Chairman typically requests Commissioners and the public alike to please “rise and assume a reverent position.” Other variations include: “Everyone please stand. Please bow your heads”; “Please bow your heads and let us pray”; and “If everyone could stand and please take a reverent stance.” One of the Commissioners then offers a prayer, which is followed by the Pledge of Allegiance, and then county business.
The Board’s invocation practice is facially neutral regarding religion. On a rotating basis, each elected Jackson County Commissioner, regardless of his religion (or lack thereof), is afforded an opportunity to open a session with a short invocation based on the dictates of his own conscience. Neither other Commissioners, nor the Board as a whole, review or approve the content of the invocations. There is no evidence that the Board adopted this practice with any discriminatory intent.
Prayers offered by the Commissioners are generally Christian in tone and often ask “God,” “Lord,” or “Heavenly Father” to provide the Commissioners with guidance as they go about their business. Some prayers ask for blessings for others, from county residents suffering particular hardships, to military members, first responders serving in Jackson County, and others. The following is illustrative of the prayers at issue:
Bow your heads with me please. Heavenly father we thank you for this day and for this time that we have come together. Lord we ask that you would be with us while we conduct the business of Jackson County. Lord help us to make good decisions that will be best for generations to come. We ask that you would bless our troops that protect us near and far, be with them and their families. Now Lord we wanna give you all the thanks and all the praise for all that you do. Lord I wanna remember bereaved families tonight too, that you would be with them and take them through difficult times. We ask these things in your son Jesus’s name. Amen.
Plaintiff, a “self-professed Pagan and Animist,” objects to this practice. In his words, the “prayers are unwelcome and severely offensive to [him] as a believer in the Pagan religion, which was destroyed by followers of Jesus Christ.” The distinctly Christian prayers offered by the Commissioners make him feel “like he [i]s in *499 Church” and that “he [i]s being forced to worship Jesus Christ in order to participate in the business of County Government.” He admits, however, that he does not stand and participate in the invocation portion of the meetings. Nor does he contend that the Commissioners dissuaded or attempted to dissuade him, or any other member of the public, from leaving the meeting during the prayer, arriving late, or protesting the practice after the fact.
And protest after the fact he did. Bor-muth first raised his concerns about the invocations during a public comment portion of an August 20, 2013, meeting. While Bormuth was speaking “on the issue of their sectarian prayers,” one of the Commissioners “swiveled his chair and turned his back to [Bormuth].” This “insulted and offended” him.
Bormuth commenced this litigation on August 30, 2013. A month later, he sought appointment to Jackson County’s Solid Waste Planning Committee. According to Bormuth’s Amended Complaint, the Board appointed two other lesser-qualified individuals instead.
Bormuth moved for summary judgment in December 2013. Following the Supreme Court’s May 2014 decision in Town of Greece and while plaintiffs motion was pending, Jackson County moved for summary judgment. Thereafter, the magistrate judge directed Bormuth to file a revised motion addressing Town of Greece. He did so in September 2014.
Ultimately, the magistrate judge issued a report and recommendation granting Bormuth’s motion for summary judgment, denying Jackson County’s motion for summary judgment, and enjoining Jackson County’s invocation practice as violative of the Establishment Clause. However, the district court rejected this portion of the magistrate’s report and recommendation and found Jackson County’s prayer practice to be consistent with the Supreme Court’s holdings in Marsh and Town of Greece. Bormuth appealed, claiming that the district court erred in concluding Jackson County’s prayer practice does not violate the Establishment Clause and abused its discretion regarding two discovery matters. On appeal, a panel of our court ruled in Bormuth’s favor on his Establishment Clause, challenge. Bormuth v. Cty. of Jackson, 849 F.3d 266 (6th Cir. 2017). Thereafter, we sua sponte granted rehearing en banc. 855 F.3d 694 (6th Cir. 2017) (mem.).
B.
Before turning to the merits of the appeal, we pause to address why our factual recitation excludes certain statements made by Commissioners after Bormuth commenced this litigation (and in particular, during a November 12, 2013, meeting of a subset of the Board to review a proposed revised invocation practice in response to Bormuth’s lawsuit—a proposal which was ultimately tabled). Both Bor-muth and Amicus Americans United for Separation of Church and State argue that because Jackson County records by video its Board of Commissioners’ meetings and makes these videos available online on its website, the videos are either in the record or are judicially noticeable for purposes of this appeal. We disagree, and refuse to fault the district court for failing to address facts that were not before it.
“Our review of a district court’s summary-judgment ruling is confined to the record.” E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 765 (6th Cir. 2015) (en banc). Under Federal Rule of Civil Procedure 56(c), the opposing party “has an affirmative duty to direct the court’s attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.” Chicago Title Ins. *500 Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2007) (quoting In re Morris, 260 F.3d 654, 665 (6th Cir. 2001)). “This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving • party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered.” Guarino v. Brookfield Twp. Trs., 980 F.2d 399, 405 (6th Cir. 1992). Simply stated, we “will not entertain on appeal factual recitations not presented to the district court when reviewing a district court’s decision.” Chicago Title Ins. Corp., 487 F.3d at 995 (internal citation omitted). And this rule applies even if an appellant proffers evidence “that might ... show a genuine issue of material fact after the district court had granted the defendants’ motion for summary judgment. ...” Cacevic v. City of Hazel Park, 226 F.3d 483, 491 (6th Cir. 2000).
Bormuth did not present any video evidence to the district court. One need look no further than the opinions of the magistrate judge and district judge to confirm this. Like the parties’ briefing below, those opinions make no reference to the videos.
We acknowledge that Bormuth’s Amended Complaint averred that “[t]he County commissioners meetings are video recorded and posted on the Jackson County website: www.co.jackson.mi.us,” and that a transcription of the offered prayers attached to his motion for summary judgment also referred to the videos’ availability. In our view, the mere reference to the videos’ general availability falls well short of “directing] the court’s attention to those specific portions of the record upon which [Bormuth sought] to rely to create a genuine issue of material fact.” Chicago Title Ins. Corp., 487 F.3d at 995 (citation omitted). Such a fleeting nonspecific reference did not require the district court to spend countless hours looking for evidence on Bormuth’s behalf in response to Jackson County’s motion for summary judgment by: (1) surfing the County’s website to find the archive of the meetings; (2) watching the several years’ worth of monthly meetings (and as but .one example, the November 12, 2013, meeting alone lasted over one hour); and (3) attempting to discover facts supporting Bormuth’s claim.' We have never required such advocacy by a district court, even for a pro se litigant. See, e.g., Guarino, 980 F.2d at 410 (a district court is not obligated to “comb the record from the partisan perspective of an advocate for the non-moving party”); cf. Pliler v. Ford, 542 U.S. 225, 231, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004) (“District judges have no obligation to act as counsel or paralegal to pro se litigants.”).
Furthermore, the manner in which this appeal was briefed is another reason to decline the invitation to supplement the appellate record. Bormuth’s initial appellate brief was silent' with respect to. the videos or their content. It was only in his reply at the panel stage that he first referenced the videos and made an argument regarding the new facts contained therein. “We have consistently held, however, that arguments made to us for the'first time in a reply brief are waived.” Sanborn v. Parker, 629 F.3d 554, 579 (6th Cir. 2010). “[W]here the facts relied upon were presented neither to the district court nor to this Court until Plaintiff Appellant filed his reply, it would be improper for the Court to find that the district court erred in its failure to consider this newly-developed ... argument,” Overstreet v. Lexington-Fayette Urban Cty. Gov’t, 305 F.3d 566, 578 (6th Cir. 2002), especially, as it is here, “when the issue raised for the first time in reply is based largely on the facts and circumstances of the case. ...” Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir. 1986). The same goes for Amicus’s attempt *501 to raise this argument. See Cellnet Commc’ns, Inc. v. F.C.C., 149 F.3d 429, 443 (6th Cir. 1998) (“While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties;”).
That leaves us with Bormuth’s and Ami-cus Americans United’s requests that we take judicial notice of the videos under Federal Rule of Evidence 201. Because Jackson County admitted the accuracy of these publicly-available videos, the argument is made that this court “must take judicial notice,” because the facts within the videos “can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned,’’.and the court has been “supplied with .the necessary information." Further, the court “may take judicial notice at any stage of the proceeding.” Fed. R. Evid. 201.
Admittedly, there is some tension between these judicial notice procedures and our voluminous case law providing that “[o]ur function is to review the case presented to the district court, rather than a better case fashioned after a district court’s unfavorable order.” DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden, 448 F.3d 918, 922 (6th Cir. 2006); cf. Sovereign News Co. v. United States, 690 F.2d 569, 571 (6th Cir. 1982) (“A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal.”). However, our court recently and persuasively addressed this tension as follows:
The problem is that taking judicial notice of ... [new evidence] now might create an evidentiary loophole through which a litigant could present, a district court with one record and then ask an appellate court to reverse the district court ’ based on another record. That would subvert the relationship between district and appellate courts. Here, the district court considered and rejected the defendants’ ..:. arguments. Now the defendants and amici urge.. reversal based in part upon facts that the defendants could have presented to the district court, but chose not to. They are not entitled- to burnish the record on appeal. See Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau, 785 F.3d 684, 690 n.2 (D.C. Cir. 2015); U.S. ex rel. Wilkins v. United Health Grp., 659 F.3d 295, 303 (3d Cir. 2011).
United States v. Carpenter, 819 F.3d 880 (6th Cir. 2016); see also Conlin v. Mort. Ele. Registration Sys., Inc., 714 F.3d 355, 360 n.5 (6th Cir. 2013); United States v. Bonds, 12 F.3d 540, 552—53 (6th Cir. 1993).
For these reasons, we decline to consider the videos presented for the first time on appeal by amicus, and then by Bormuth in his reply.[2]
C.
There is one more preliminary matter to resolve at the outset, relating to a discovery issue.[3] After Bormuth moved for summary judgment, he sought to depose the County’s Administrator and three Commissioners. In his Rule 26 disclosures, Bormuth identified these individuals as possessing information regarding “the County Commissioner’s practice of offer *502 ing a prayer invocation at the opening of their regular monthly meetings,” “the practice of having children lead the Pledge of Allegiance which directly follows the invocation on the agenda,” and “Plaintiffs activities regarding the Jackson County Resource Recovery Facility.” He further explained his desire to take these depositions in response to Jackson County’s motion to quash, noting he wanted to discover “the practice, intent, and history of the invocations, [County Administrator] Over-ton’s proposed [revised invocation] policy, and the role that religious interest and bias from the Commissioners has played in this case.” The magistrate judge granted the motion to quash because of the pending cross-motions for summary judgment. That is, Bormuth did “not indieate[] the need for any additional discovery in order to fully respond to defendant’s motion or to support his own motion as required by Federal Rule of Civil Procedure 56(d).” The district court agreed to quash the scheduled depositions for different reasons: under Town of Greece, “the Commissioners’ private and personal attitudes toward religion or nonreligion are not relevant to the present action.” It also ruled that to the extent he sought information about the Jackson County Resource Recovery Facility, it was irrelevant because Bormuth alleged an Establishment Clause claim, not an employment discrimination claim.
We review district court decisions regarding discovery matters for abuse of discretion. See Himes v. United States, 645 F.3d 771, 782 (6th Cir. 2011). A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard. Cummins v. BIC USA, Inc., 727 F.3d 506, 509-10 (6th Cir. 2013).
We conclude that the district court did not abuse its discretion because Bor-muth failed to comply with Federal Rule of Civil Procedure 56(d). As the magistrate judge correctly recognized, Bormuth did not assert his need to take these depositions in response to Jackson County’s motion for summary judgment. Under Rule 56(d), Bormuth could have opposed this motion on the grounds that he could not “present facts essential to justify its opposition.” “We have observed that filing an affidavit that complies with Rule 56(d) is essential, and that in the absence of such a motion or affidavit, ‘this court will not normally address whether there was adequate time for discovery.’ ” Unan v. Lyon, 853 F.3d 279, 292 (6th Cir. 2017) (citation omitted). Although we have set aside Rule 56(d)’s formal affidavit requirement “when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment,” id. at 293 (citation omitted), there is no need to do so here.
By twice moving for summary judgment, Bormuth conceded his position “that there [wa]s no genuine dispute as to any material fact and that ... [he wa]s entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). Thus, instead of responding to Jackson County’s motion for summary judgment by arguing the need for additional discovery, Bormuth’s motions for summary judgment expressly disclaimed it. See Unan, 853 F.3d at 293 (finding no abuse of discretion where, despite plaintiffs providing of some evidence about the need for additional discovery, the plaintiff subsequently moved for summary judgment). We therefore decline to sanction the “I did not have all the evidence I needed” argument made for the first time following the district court’s adverse ruling on the cross-motions for summary judgment.
*503 II.
We review the district court’s grant of summary judgment de novo. Rogers v. O’Donnell, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the nonmovant, Rogers, 737 F.3d at 1030, “the plain language of Rule 56[ ] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
III.
The Supreme Court has recognized “[w]e are a religious people whose institutions presuppose a Supreme Being.” Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (emphasis added). All three of our branches of government have officially acknowledged religion’s role in American life. See Lynch v. Donnelly, 465 U.S. 668, 674—78, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (detailing the “official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders”).
Legislative prayer is part of this tradition: “The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country.” Marsh, 463 U.S. at 786, 103 S.Ct. 3330; see also Smith v. Jefferson Cty. Bd. of Sch. Comm’rs, 788 F.3d 580, 588 (6th Cir. 2015) (“At the state and local levels, too, legislative prayer has long been accepted.” (citing Town of Greece, 134 S.Ct. at 1819)). Indeed, “the Framers considered legislative prayer a benign acknowledgment of religion’s role in society.” Town of Greece, 134 S.Ct. at 1819 (emphasis added). It “has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of ‘God save the United States and this honorable Court’ at the opening of [the Supreme Court’s (and Sixth Circuit’s)] sessions.” Id. at 1825 (Kennedy, J.). That tradition includes offering prayers, even those that reflect “beliefs specific to only some creeds,” that “seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws.” Id. at 1823 (Majority Op.). With this historical grounding, it comes as no surprise that the Supreme Court has twice approved the practice of legislative prayer as consistent with the Framers’ understanding of the Establishment Clause. Because these cases shape our inquiry, we examine Marsh and Town of Greece in detail.
A.
The Supreme Court first rejected an Establishment Clause challenge to legislative prayer in Marsh. That case examined the Nebraska Legislature’s practice of opening its sessions with a prayer by its chaplain. The salient facts of Nebraska’s practice included that the chaplain was of only one denomination (Presbyterian); the Legislature selected the chaplain for sixteen consecutive years and paid him with public funds; and the chaplain gave prayers “in the Judeo-Christian tradition.” 463 U.S. at 793, 103 S.Ct. 3330.
In rejecting the claim that Nebraska’s invocation practice violated the Establishment Clause, the Supreme Court empha *504 sized legislative prayer’s deep historical roots: "From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.” Id. at 786, 103 S.Ct. 3330. Notable to the Court was how the drafters of the Establishment Clause embraced this practice. In 1774, the Continental Congress “adopted the traditional procedure of opening its session with a prayer offered by a paid chaplain.” Id. at 787, 103 S.Ct. 3330. And in one of its “early items of business,” the First Congress “adopted the policy of selecting a' chaplain to open each session with prayer” and “authorized the appointment of paid chaplains” just three days before it approved the language of the First Amendment. Id. at 787-88, 103 S.Ct. 3330.
Based on this “unique,” “unambiguous and unbroken history,” the Court held that “the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an ‘establishment’ of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.” Id. at 791-792, 103 S.Ct. 3330. Stated a different way, “[cjlearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.” Id. at 788, 103 S.Ct. 3330.
That the Nebraska Legislature selected a chaplain of the same denomination for sixteen consecutive years was of no moment: “Absent proof that the chaplain’s reappointment stemmed from an impermissible motive,” one could not “perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church.” Id. at 793, 103 S.Ct. 3330. Nor was it material that public funds paid for the chaplain, given that the Continental Congress did the same. Id. at 794, 103 S.Ct. 3330. And finally, the Supreme Court cautioned against the judiciary “embark[ing] on a sensitive evaluation or ,,. parsing] the content of a particular prayer.” Id. at 795, 103 S.Ct. 3330. That is, “[t]he content of the prayer is not of concern to judges where .,., there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330.
B.
Marsh is widely viewed as “carving out an exception to the [Supreme] Court’s Establishment Clause jurisprudence ... because it sustained legislative prayer without subjecting the practice to any of -the formal tests that have traditionally structured this inquiry.” Town of Greece, 134 S.Ct. at 1818 (citation and quotation marks omitted). This includes the generally applicable three-part Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), test for which Bormuth advocates. See, e.g., Am. Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd., 243 F.3d 289, 305-06 (6th Cir. 2001) (en banc); accord Smith, 788 F.3d at 589-90.
Unfortunately, dicta in the Marsh opinion led to judicial confusion regarding its holding. This arose from a footnote in which' the Court explained the “Judeo-Christian” nature of the prayers:
[Chaplain] Palmer characterizes, his prayers as “nonsectarian,” “Judeo Christian,” and with “elements of the American civil-religion.” Although some of his earlier prayers were often explicitly *505 Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.
463 U.S. at 793 n.14, 103 S.Ct. 3330 (internal citations omitted). In County of Allegheny v. A.C.L.U., 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a case involving a creche placed on the steps of a county courthouse, the Court drew a distinction between sectarian and nonsectarian references based upon this footnote. Id. at 603, 109 S.Ct. 3086. The nonsectarian reference in Marsh, as “recast[ ]” by County of Allegheny, Town of Greece, 134 S.Ct. at 1821, led some courts, including our own, to conclude that the constitutionality of ceremonial prayer turned, upon content neutrality. See Stein v. Plainwell Cmty. Sch., 822 F.2d 1406, 1410 (6th Cir. 1987); see also Rubin v. City of Lancaster, 710 F.3d 1087, 1094 n.6 (9th Cir. 2013) (collecting cases). The Supreme Court corrected this error in Town of Greece v. Galloway.
C.
In Town of Greece, the town council invited local ministers to give invocations before each town board meeting. 134 S.Ct. at 1816. The town permitted any person of any faith to give the invocation, did not review the prayers in advance, and did not provide any guidance as to tone or content. Id. Although some had a “distinctly Christian idiom,” and for eight years only Christian ministers gave prayers, upon complaint of such pervasive themes, the town expressly invited persons of other faiths to deliver the prayer. Id. at 1816—17. Contending that the Establishment Clause mandated that legislative prayers be “inclusive and ecumenical” to a “generic God,” some town residents sued. Id. at 1817.
In reversing the Second Circuit’s decision that Greece’s practice "violated the Establishment Clause, the Supreme Court again emphasized the unique nature of legislative prayer: “legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society.” Id. at 1818. Purposeful prayers seeking to solemnly bind legislators are consistent with our tradition where the prayer givers “ask . their. own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends.” Id. at 1823. Most importantly, history teaches that these solemn prayers “strive for the idea that people of many faiths may be united in a community.of tolerance and devotion.” Id. They are permissible because “[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.” Id. This tradition extends not just to state and federal legislatures, but also to local deliberative bodies like city councils. Id. at 1819; see also Am. Humanist Ass’n v. McCarty, 851 F.3d 521, 527 (5th Cir. 2017) (applying Town of Greece to prayers before school boards).[4]
Accordingly, the Supreme Court in Town of Greece directed that a court’s *506 “inquiry ... must be to determine whether the prayer practice [at issue] fits within the tradition long followed in Congress and the state legislatures,” and held that Greece’s did. 134 S.Ct. at 1819. First, the Court rejected the notion that Marsh permits only generic prayers, abrogating County of Allegheny and overruling decisions to the contrary. Id. at 1820—24. That is, “Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content.” Id. at 1821. Marsh revolved not on espousement of “generic theism,” but rather on the “history and tradition” showing prayer—even one that is explicitly Christian in tone—“in this limited context could coexist with the principles of disestablishment and religious freedom.” Id. at 1820 (citation and alteration omitted). Requiring nonsectarian prayers “would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town’s current practice of neither editing or approving prayers in advance nor criticizing their content after the fact.” Id. at 1822. Put differently, once the government has “invite[d] prayer into the public sphere,” it “must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.” Id. at 1822—23. Nonetheless, the Court acknowledged that there are limits to the prayers’ content to fit within our historical tradition:
The relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation’s heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort.
[[Image here]]
Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not “exploited to proselytize or advance any one, or to disparage any other, faith or belief.”
Id. at 1823 (quoting Marsh, 463 U.S. at 794—95, 103 S.Ct. 3330).
The Supreme Court in Town of Greece had little trouble finding the invocation prayers were in keeping with our tradition. Id. at 1824. Though invoking Jesus and other Christian references, the prayers involved “universal themes” such as celebrating the changing of the seasons or calling for a “spirit of cooperation.” Id. To be sure, some prayers strayed from these themes, with one condemning “objectors [to the prayer practice] as a minority who are ignorant of the history of our country” and another “lamenting] that other towns did not have God-fearing leaders.” Id. (quotation marks omitted). But these remarks did not “despoil a practice that on the whole reflects and embraces our tradition.” Id. That is, “[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. Marsh ... requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer.” Id.
*507 The Court also rejected the claim that the town violated the Establishment Clause by inviting predominantly Christian ministers to lead the prayer, noting that the town made reasonable efforts to identify all congregations within its borders and represented that it would welcome a prayer by anyone who wished to give one. Id. Moreover, the town’s composition of nearly all Christians did not “reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing.” Id.
Next, the Supreme Court addressed the petitioner’s claim “that the setting and conduct of the town board meetings create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board.” Id. at 1820.
Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, analyzed coercion broadly in the context of the “subtle coercive pressures” the audience might feel while listening to the prayer. He emphasized that “[t]he inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed,” and “must be evaluated against the backdrop of historical practice.” Id. at 1825. (Kennedy, J.). Notably, Justice Kennedy applied the following presumption: “the reasonable observer is acquainted with this tradition and understands that [legislative prayer’s] purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews.” Id. It is the “lawmakers themselves,” not the public, who are the “principal audience for these invocations” as they “may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing.” Id. “For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.” Id. at 1826. And in concluding that “legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate,” Justice Kennedy emphasized that “[ajdults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions.” Id. at 1826—27.
In one paragraph, the three Justices discussed hypothetical facts that could change their analysis:
The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to *508 rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive, not coercive. Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support. Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined. In no instance did town leaders signal disfavor toward nonparticipants or suggest that their stature in the community was in any way diminished. A practice that classified citizens based on their religious views would violate the Constitution, but that is not the case before this Court.
Id. at 1826 (citations omitted). They also noted the audience had options to avoid the prayers altogether:
Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in Marsh, board members and constituents are “free to enter and leave with little comment and for any number of reasons.” Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who “presumably” are “not readily • susceptible to religious indoctrination or peer pressure.”
Id. at 1827 (citations omitted).
Justices Thomas and Scalia did not join the coercion section of Justice Kennedy’s opinion (Part II-B), but expressly disagreed with it. In a separate opinion, Justice Thomas, joined by Justice Scalia, wrote that coercion is limited to “coercive state establishments” “by force of law or threat of penalty,” such as mandatory church attendance, levying taxes to generate church revenue, barring ministers who dissented, and limiting political participation to members of the established church. Id. at 1837 (Thomas, J., concurring in part and in the judgment). Therefore, they rejected Justice Kennedy’s broadening of coercion to also include social pressures:
At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modem notions that the Establishment Clause is violated whenever the “reasonable observer” feels “subtle pressure,” or perceives governmental “endorsement].”
* * *
Thus, to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts—not the “subtle coercive pressures” allegedly felt by respondents in this case. The majority properly concludes that “[o]f-fense ... does not equate to coercion,” since “[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum.” I would simply add, in light of the foregoing history of the Establishment Clause, that “[p]eer pressure, un *509 pleasant as it may be, is not coercion” either.
Id. at 1838 (alterations in original and internal citations omitted).
IV.
Our first inquiry is “to determine whether the prayer practice in [Jackson County] fits within the tradition long followed in Congress and the state legislatures.” Id. at 1819 (Majority Op.). We hold that it does,[5]
A.
At the heart of this appeal is whether Jackson County’s prayer practice falls outside our historically accepted traditions because the Commissioners themselves, not chaplains, or invited community members, lead the invocations. Bormuth contends legislator-led prayer is per se unconstitutional, and “[b]ecause each Commissioner is- Christian ..., every prayer offered has been Christian” and therefore the Jackson County Board of Commissioners is endorsing the Christian faith. We reject this narrow reading of the Supreme Court’s legislative-prayer jurisprudence and our history.
1.
There is no support for Bormuth’s granular view of legislative prayer. In this regard, neither Marsh nor Town of Greece restricts who may give prayers in order to be consistent with historical practice. In Marsh, for example, the Supreme Court separately listed “paid legislative chaplains and opening prayers” as consistent with the Framers’ understanding of the Establishment Clause. 463 U.S. at 788, 103 S.Ct. 3330 (emphasis added). And Town of Greece made clear that we are .to focus upon- “the prayer opportunity as a whole” in light of “historical practices and understandings.” 134 S.Ct. at 1819, 1824 (citation omitted).
Most significantly, history shows that legislator-led prayer is .a long-standing tradition. Before the founding of our Republic, legislators offered prayers to commence legislative sessions. See, e.g., American Archives, Documents of the American Revolutionary Period, 1774-76, v1:1112 (documenting legislator-led prayer in South Carolina’s legislature in 1775); see also Town of Greece, 134 S.Ct. at 1833 (Alito, J., concurring); cf. S. Rep. No. 32-376, at 4 (1853) (“[The Founders] did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators.”). Legislator-led prayer has persisted in various state capitals since at least 1849.[6] See Brief of. Amici Curiae *510 State of Michigan and Twenty-One Other States, at 5-6; Brief of Amici Curiae Local and State Legislators and the Commonwealth of Kentucky, at 5-9; Brief of Amici Curiae Members of Congress, at 4. Indeed, the Michigan House of Representatives and Senate sit just north of Jackson County and have documented legislator-led prayer examples dating back at least to 1879 and 1898, respectively. See H.R. Journal, at 10, 82, 591, 956 (Mich.1879) (prayers by representatives); S. Journal, Extra Sess., at 180 (Mich. 1898) (prayer by senator).[7]
These historical examples are consistent with those relied upon by the Supreme Court to find traditions of legislative prayer in Marsh and Town of Greece. Nebraska’s legislature, noted the Court in Marsh, paid a chaplain since at least 1867. 463 U.S. at 794, 103 S.Ct. 3330. The same is true for Town of Greece, where the Court extended Marsh from state capitals to town halls by way of one prayer offered before the City Counsel of Boston in 1910. 134 S.Ct. at 1819. Amici’s helpful identification of the historical breadth of legislator-led prayer in the state capitals for over one hundred fifty years more than confirms to us that our history embraces prayers by legislators as part of the “benign acknowledgment of religion’s role in society.” Id. Accordingly, we give no credence to Bormuth’s contention that these examples are just “historical aberrations.” The same can be said for the Fourth Circuit’s conclusion in Lund that legislator-led prayer is a “phenomenon [that] appears to be the exception to the rule,” 863 F.3d at 279, especially because that court apparently did not consider the numerous examples of such prayers presented to us.
As reflected in Marsh and Town of Greece, this history of legislators leading prayers is uninterrupted and continues in modern time. Take Marsh’s conclusion that “the practice of opening sessions with prayer ... has also been followed consistently in most of the states.” 463 U.S. at 788-89, 103 S.Ct. 3330. In drawing this conclusion, the Court relied on an amicus brief by the National Conference of State Legislatures (“NCSL”), which surveyed the various practices across the state legislatures. Id. at 789 n.11, 103 S.Ct. 3330. The NCSL expressly disclaimed the notion that chaplain-only prayers are the norm: “The opening legislative prayer may be given by various classes of individuals. They include chaplains, guest clergymen, legislators, and legislative staff members. ... All bodies, including those with regular chaplains, honor requests from individual legislators either to give the opening prayer or to invite a constituent minister to conduct the prayer.” Brief of NCSL as Amicus Curiae, Marsh v. Chambers, 463 U.S. 783 (1983) (No. 82-83), 1982 WL 1034560, at *2, *3 (emphasis added).
*511 The record in Town of Greece also shows the long-standing practice of legislator-led prayer has continued to today. Observe the prayer offered by one of Greece’s councilmen (and one that is quite similar to the prayers offered here):
Please bow your heads and join me in prayer. Heavenly Father we thank you for this day. We thank you for the opportunity to now join together here to conduct the important public business that is before us. We ask that you would guide the decision making and the discussions that take place this evening, and that you would bless each of the participants in the town board as well as all of those who are here in the audience and may be viewing on television. We pray this in your name, amen.
Joint Appendix at 66a-67a, Town of Greece v. Galloway, 134 S.Ct. 1811 (2014), 2013 WL 3935056. Other council members offered silent prayers, directing the audience to “remain standing” and “bow heads” while reflecting upon the September 11, 2001, terrorist attacks and Greece residents who recently passed away. Id. at 26a—27a, 29a, 45a, 57a.
Here, Jackson County presented a 2002 NCSL study reinforcing the earlier conclusion cited in Marsh that chaplains do not exclusively give opening prayers: “Forty-seven chambers allow people other than the designated legislative chaplain or a visiting chaplain to offer the opening prayer. Legislators, chamber clerks and secretaries, or other staff may be called upon to perform this opening ceremony.” (Emphasis added.) More specifically, legislators gave prayers in thirty-one states. The same study notes that only members are permitted to deliver prayers in Rhode Island. Closer to Jackson County, for example, the Michigan House of Representatives permits an invocation to “be delivered by the Member or a Member’s guest.” Mich. H.R. R. 16 (emphasis added). So, too, does Congress. See, e.g., 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (documenting invocation by Oklahoma Senator James Lankford); United States House of Representatives, Office of the Chaplain, Guest Chaplains, http://chaplain. house.gov/chaplaincy/guesL_chaplains.html (last visited Aug. 15, 2017) (listing guest chaplains “who have been recommended by the Members of Congress”); Sen. Robert C. Byrd, Senate Chaplain, in 2 The Senate, 1789-1989, Addresses on the History of the United States Senate 297, 305 (1982); see also Brief of Amici Curiae State of Michigan and Twenty-One Other States, at 10—12 (listing over 100 counties within the Sixth Circuit alone that permit lawmaker-led prayer).
This tradition of legislator-led prayer makes sense in light of legislative prayer’s purpose—it “invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing.” Town of Greece, 134 S.Ct. at 1823. Legislative prayer exists “largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers.” Id. at 1826 (Kennedy, J.). It “reflects] the values [public officials] hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.” Id. As one of Jackson County’s Commissioners stated, “Commissioners, as individuals, have a right to pray as we believe.” Preventing Jackson County’s Commissioners from giving prayers of their own choosing detracts from their ability to take “a moment of prayer or quiet reflection [to] set[ ] the[ir] mind to a higher purpose and thereby ease[] the task of governing.” Id.
Town of Greece instructs that “government must permit a prayer giver to ad *512 dress his or her own God or gods as conscience dictates,” and that it is not the role of the judiciary to act “as [a] supervisor[ ] and censor[ ] of religious speech.” Id. at 1822 (Majority Op.). We heed this advice and decline the invitation'to find an appreciable difference between legislator-led and legislator-authorized prayer given its historical pedigree. Put simply, we find it insignificant that the prayer-givers in this case are publicly-elected officials. In our view and consistent with our Nation’s historical tradition, prayers by agents (like in Marsh and Town of Greece) are not constitutionally different from prayers offered by principals. See also Turner v. City Council of City of Fredericksburg, 534 F.3d 352, 355—56 (4th Cir. 2008) (O’Connor, J., retired) (finding in a pre-Town of Greece case that opening prayers offered by only city council members were permissible under the Establishment Clause). The Establishment Clause does, not .tolerate, much less require, such mechanical line drawing. See Lynch, 465 U.S. at 678-79, 104 S.Ct. 1355 (“The line between permissible relationships and those barred by the [Establishment] Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test.”).
Here, thé district court correctly concluded that if “the constitutionality of a legislative prayer is predicated on the identity of the speaker, potentially absurd results would ensue. Under such'a holding, an invocation delivered in one county by a guest minister would be upheld, while the identical invocation delivered in another county by one of the législators would be struck down.” See also Am. Humanist, 851 F.3d at 529 (“It would be nonsensical to permit legislative prayers but bar the legislative officers for whom they are being primarily recited from participating in the prayers in any way.”).
2.
Although the prayers offered before the Board generally espouse the Christian faith, this does not make the practice incompatible with the Establishment Clause. Quite the opposite, the content of the prayers at issue here falls within the religious idiom accepted by our Founders. Consistent with Town of Greece, the solemn and respectful-in-tone prayers demonstrate the Commissioners permissibly seek guidance to “make good decisions, that will be best for generations to . come” and express well-wishes to military and community members. Cf. 134 S.Ct. at 1823. The prayers “vary in their.degree of religiosity” and often “invoke the name of Jesus, the Heavenly Father, or the Holy Spirit,” but Town of Greece makes clear the Founders embraced' these universal and sectarian references as “particular means to universal ends.” Id. at 1823-24.
Nor do the prayers themselves fall outside Town of Greece’s pertinent constraint on content—there is no evidence that the “invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion” or that there is a “pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose.” Id. at 1823, 1824. Bormuth has identified one portion of one prayer where a Commissioner stated, “Bless the Christians worldwide who seem to be targets of killers and extremists”; he claims this is evidence of a prayer practice that “denigrates all nonbelievers and minority faiths.” Even assuming that such a reference “disparagefe] those who did not accept the ,,. prayer practice,” this stray remark does “not despoil a practice that on the whole reflects and embraces our tradition.” Id. at 1824. One stray remark, we might add, pales in comparison to the litany of prayers the Fourth Circuit concluded *513 impermissibly advanced Christianity in Lund, 863 F.3d at 284-85 (detailing prayers that “implicitly ‘signaled disfavor toward’ non-Christians,” “characterized Christianity as ‘the one and only way to salvation,’ ” “proclaimed] that Christianity is exceptional and suggested] that other faiths are inferior,” and “urged attendees to embrace Christianity, thereby preaching conversion”) (citations and brackets omitted); but see id. at 313-16 (Agee, J., dissenting) (criticizing majority for condemning prayers similar to those approved in Marsh and Town of Greece).
That the prayers reflect the individual Commissioners’ religious beliefs does not mean the Jackson County Board of Commissioners is “endorsing” a particular religion, Christianity or otherwise. For one, while all the Commissioners presumably believe in Jesus Christ, the faiths of Christianity are diverse, not monolithic. The Reformation of the Sixteenth Century spawned an explosion of Christian faiths. Many of those practicing these new Christian faiths sought religious freedom in America and found refuge from the tyranny inflicted by sectarian governments. To guarantee religious liberty to all persons, including those practicing the emerging Christian religions, the drafters and ratifiers of the First Amendment of our Constitution provided:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.
U.S. CONST, amend. I.
We do not know the religious faiths of the 2013-2014 Jackson County Commissioners. The nine “Christian” Commissioners may have included Roman Catholics, Southern Baptists, Mormons, Quakers, Episcopalians, Lutherans, Methodists, and others;
Nor do we know the religious faiths of the current Commissioners. But we do know that Commissioners of different faiths, or no faith, may be elected. With each election, the people of Jackson County may elect a Commissioner who is Muslim, Buddhist, Hindu, Jewish, Mormon, Roman Catholic, Eastern Orthodox Christian, Baptist, Methodist, Presbyterian, Lutheran, Episcopalian, .Congregationalism Quaker, Amish, Mennonite, Pentecostal, Animist, Pagan, Atheist, or Agnostic (and so on). The religious faiths of periodically elected officials—including Jackson County’s Commissioners—are dynamic, not static. In fact, east of Jackson County is the City of Hamtramck, Michigan, which just elected a Muslim majority city council.[8] Were Mr. Bormuth elected to the Jackson County Board of Commissioners, he could freely begin a legislative session with an invocation of his choosing, under the religion-neutral Jackson County -prayer practice.
It is clear from Marsh and Town of Greece that creed-specific prayers alone do not violate the First Amendment. Specifically, in Marsh, the Supreme Court sanctioned .the. practice of selecting the same Presbyterian clergyman for sixteen consecutive years. 463 U.S. at 793, 103 S.Ct. 3330. And in Town of Greece, the Supreme Court instructed that Marsh did not “imply the rule that prayer violates the Establishment Clause any time it is given in the name of a figure deified , by only one faith or creed.” 134 S.Ct. at 1821. Rather, “[p]rayer that reflects, beliefs, specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not ‘exploited to proselytize or *514 advance any one, or to disparage any other, faith or belief.’ ” Id. at 1823 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330).
Thus, in the present case, the district court correctly concluded that the all-Christian makeup of the Commissioners is “immaterial”:
As elected officials, they were chosen as representatives whose interests were most closely aligned with the public’s, and their personal beliefs are therefore a reflection of the community’s own overwhelmingly Christian demographic. ... [T]he future may bring Commissioners of more diverse religious backgrounds who will deliver invocations in those traditions. To hold otherwise would contravene Marsh’s sanction of legislative prayer delivered for sixteen years by a single Presbyterian clergyman.
This reasoning also aptly applies Town of Greece ⅛ express command that once government “invites prayer into the public sphere,” it “must permit a prayer giver to address his or her own God or gods as conscience dictates. ...” Id. at 1822.
Marsh and Town of Greece do not require Jackson County to provide opportunities for persons of other faiths to offer invocations. Just like Greece, Jackson County maintains a facially neutral prayer policy. Id. at 1824. Under this policy, the Board as a whole cannot be said to “act as supervisors and censors of religious speech. ...” Id. at 1822. To the extent the prayer opportunity in Town of Greece produced prayers by a variety of faiths, we disagree with the dissent and the Fourth Circuit that Town of Greece’s holding is dependent upon religious heterogeneity. See Lund, 863 F.3d at 281-82. Its holding on this point is that “[s]o long as the town maintains a policy of nondiscrimination,” the Establishment Clause does not mandate a municipality of predominately one faith to “achieve religious balancing.” Town of Greece, 134 S.Ct. at 1824. Jackson County’s prayer policy permits prayers of any—or no—faith, and the County need not adopt a different policy as part of a “quest to promote a diversity of religious views.” Id. (internal quotation marks omitted). To find otherwise would “require the [County] to make ... judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each.” Id. (alterations and citation omitted). But as Town of Greece commands, such “judgments” are “wholly inappropriate.” Id. (citation omitted).
Finally, religious “endorsement” is a thread woven by the Lemon test. Smith, 788 F.3d at 587 (explaining that “the Sixth Circuit ‘has treated the endorsement test as a refinement or clarification of the Lemon test’ ” (citation omitted)). Were we to agree with our dissenting colleagues that the prayers by the Jackson County Commissioners run afoul of the Establishment Clause because the prayer-givers and the government officials are “one and the same” (i.e., “excessive entanglement”) and therefore “the Commissioners are effectively endorsing a specific religion,” we would be rewriting thirty-plus years of Supreme Court jurisprudence—by applying Lemon’s endorsement rubric in lieu of looking through history’s lens as dictated by Marsh and Town of Greece.
Neither Marsh nor Town of Greece applies Lemon’s balancing of purposes and government entanglement when examining the constitutionality of legislative prayer. Rather, Marsh “carv[ed] out an exception to the Court’s Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry.” Town of Greece, 134 S.Ct. at 1818 (internal quota *515 tion marks and citation omitted). As we have previously noted en banc before, “even the author of the Lemon decision, the late Chief Justice Burger, did not see fit to apply the Lemon test when he wrote the Court’s opinion in [Marsh].” Am. Civil Liberties Union of Ohio, 243 F.3d at 305-06. This omission is made all the more notable by the fact that Justice Brennan expressly advocated for application of the Lemon-test in dissent, and the lower court opinion applied Lemon. Marsh, 463 U.S. at 797-801, 103 S.Ct. 3330 (Brennan, J., dissenting) (discussing “indirect coercive pressure upon religious minorities to conform” in the context of the Lemon test); Chambers v. Marsh, 675 F.2d 228, 233-35 (8th Cir. 1982). Accordingly, we follow the Supreme Court’s precedent and conclude Lemon ⅛ endorsement test is inapplicable to legislative prayer cases.[9] See also Elmbrook Sch. Dist. v. Doe, — U.S. —, 134 S.Ct. 2283, 2284, 189 L.Ed.2d 795 (2014) (Scalia, J., dissenting from the denial of certiorari) (“Town of Greece abandoned the antiquated ‘endorsement test.’ ”); Jones v. Hamilton Cty. Gov’t, 530 Fed.Appx. 478, 487-88 (6th Cir. 2013) (in pre-Tom of Greece case, stating that “[gjiven the Supreme Court’s choice not to apply Lemon in Marsh, we decline Appellants’ invitation” to apply Lemon).
B.
On the issue of coercion, the Town of Greece decision produced a majority result, but not a majority rationale. Under these circumstances, Marks v. United States provides that “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. ...” 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citation omitted). “Taken literally, Marks instructs lower courts to choose the ‘narrowest’ concurring opinion and to ignore dissents.” United States v. Cundiff, 555 F.3d 200, 208 (6th Cir. 2009) (citation omitted). That is, we take the “one which relies on the ‘least’ doctrinally ‘far-reaching-common ground’ among the Justices in the majority. ...” Id. at 209 (citation omitted).
In our panel opinion, we were divided regarding whether Justice Kennedy’s three-Justice plurality opinion or Justice Thomas’s two-Justice concurring opinion controls under Marks on the question of coercion. Compare Bormuth v. Cty. of Jackson, 849 F.3d 266, 279-81 (6th Cir. 2017) (Moore, J.), with id. at 304-05 (Griffin, J., dissenting).[10] Because Bormuth’s *516 challenge fails under either standard, we need not resolve this issue.
1.
First, Justice Kennedy’s opinion. The societal “pressures” exerted upon Bormuth during the prayers are consistent with those advanced by the petitioners in Town of Greece and rejected by Justice Kennedy. Under his approach, whether a legislative prayer'practice rises to the level of coercion “remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed,” and “must be evaluated ' against the backdrop of historical practice.” 134 S.Ct. at 1825 (Kennedy, J.); see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (“Whether a government activity violates the Establishment Clause is ‘in large part a legal question to be answered on the basis of judicial interpretation of social facts. Every government practice must be judged in its unique circumstances.’” (alteration and citation omitted)). We presume that a “reasonable observer ... understands that ... [the] purpose [of legislative prayer is] ... to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an 'opportunity to proselytize or force truant constituents into the pews.” 134 S.Ct. at 1825 (Kennedy, J.). That we permit legislative prayer “does not suggest that those who disagree are compelled to join the expression or approve its content.” Id,; see also id. at 1827 (“But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they .need not participate.”).
We start, consistent with Town of Greece, by declining to view the coercive effect of prayers at local government meetings differently from the effect of prayers at legislative sessions because local government meetings are small, intimate, and often involve citizens raising issues that most immediately affect their lives. In these tightknit gatherings of a few community members, the argument goes, residents who appear before local officials are likely to join in prayers despite misgivings for fear of offending the officials. To be sure, this difference was at the core of an opinion in Town of Greece: Justice Kagan’s dissent. Id. at 1851-52 (Kagan, J., dissenting) (“The majority thus gives short shrift to the gap—more like, the chasm— between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens.”). However, the five Justices in the Town of Greece majority did not adopt these distinctions. Neither do we.
It is significant here, as in Town of Greece, that “[n]othing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late/ or even, as happened here, making a later protest.” Id. at 1827 (Kennedy, J.).[11] Bormuth ad *517 mitted to not participating* in Jackson County’s prayer practice. His “quiet acquiescence [should] not, in light- of our traditions, be interpreted as an agreement 'with the words or ideas expressed.” Id. -
Instead of acknowledging this' critical concession, Bormuth and Amicus Americans United argue Jackson County’s invocation practice is coercive in three ways Town of Greece was not: (1) - the Board’s Chairman (or'other Commissioners) preface the prayers with a request to rise* and assume a reverent position; (2) two Commissioners-turned their backs on Bormuth while he was speaking during public comment, and two others made statements reflecting their dislike of him; and (3) the Board denied Bormuth’s -requests-to-sit on two citizen committees. They therefore contend that application of Justice Kennedy’s coercion standard requires a- different outcome. We disagree.
First of all, we do not agree that soliciting adult members of the public to assist in solemnizing the meetings by rising and remaining quiet in a'reverent position is coercive. See Am. Humanist Ass’n, 851 F.3d at 526 (“polite requests” by governmental officials to stand for invocations “do not coerce .prayer”). These “commonplace” and “reflexive” requests—-whether from ministers or elected individuals following their own faith’s' normative cues— do not alone mandate participation, especially as most are preceded; with a polite “please.” Town of Greece, 134 S.Ct. at 1832 (Alito, J., concurring).- We* do not think there is a constitutional difference here, for government-sanctioned prayers by official chaplains or invited community members still fall within the ambit of the Establishment Clause. More importantly, and as the district court stated, “[although nonadherents to Christianity such as Bormuth may fear that their business before the Board would be prejudiced if the Commissioners observed their noncompliance with the request to stand, the risk of prejudice is no greater if the request is delivered by.a Commissioner than if it is delivered by a guest chaplain. In both situations, the Commissioners are equally capable of observing those who comply and those who do not.” And, it is not as if a Commissioner specifically ordered Bormuth to stand and remain reverent in the face of Bormuth’s protest to the contrary. See, e.g., Fields v. Speaker of the Penn. House of Representatives, 251 F. Supp. 3d 772, 776, 788, 2017 WL 1541665, at *2, 11 (M.D. Pa. Apr. 28, 2017) (plaintiffs plausibly pled a violation of the Establishment Clause in a legislative prayer case where the Speaker of the House “publicly singled out [objectors] and ordered them to rise for the invocation,” and “[w]hen they refused, the Speaker directed" a legislative security officer to ‘pressure’ them to stand”).
Second, that two Commissioners on separate occasions turned their backs on Bormuth during his public comments gives us no constitutional pause. One of these incidents was in response to Bormuth’s comments about abortion and thus unrelated to the Board’s invocation practice. Rather, as the district court found, “the[ ] behavior [wa]s likely an unfortunate expression of their own personal sense of affront elicited .by [Bormuth’s] sentiments.” Moreover, these isolated incidents are not indicative of a “pattern and practice” of coercion against nonbelievers of religion. Town of Greece, 134 S.Ct. at 1826 (Kennedy, J.).
Bormuth and Amicus Americans United also point to post-litigation statements made by two of the Commissioners as reported in a local newspaper as evidence of him being treated differently on account *518 of his complaints regarding the prayer practice. Those statements are as follows:
• Commissioner Rice: “[Bormuth] is attacking us and, from my perspective, my Lord and savior Jesus Christ. Our civil liberties should not be taken away from us, as commissioners.”
• Commissioner Duckham: “What about my rights? ... If a guy doesn’t want to hear a public prayer, he can come into the meeting two minutes late.”
• Duckham: “All this political correctness, after a while I get- sick of it.”
• Rice: ‘We Commissioners, as individuals, have a right to pray as we believe.”
Three are in the context of an individual’s right to offer a prayer of his faith, without preclearance by “an administrator or judge,” and thus offer no help to Bormuth. Id. at 1822-23 (Majority Op.). That is, their comments confirm the prayers accommodate the Commissioners’ spiritual needs and are not directed toward the audience. Id. at 1826 (Kennedy, J.). The fourth, the political correctness comment, at worst reflects a stray statement by one of the nine Commissioners and is not reflective of the Board as a whole.
Moreover, nothing in the record suggests that the Commissioners who turned their backs on Bormuth or spoke out about him in public were expressing antagonism for his religious beliefs. Rather, the record reflects they reacted to his antagonism toward them. Individuals in Jackson County, including elected officials, know what getting sued by Bormuth feels like, having been in the position many times before. See, e.g., Bormuth v. City of Jackson, No. 12-11235, 2013 WL 1944574, at *2 (E.D. Mich. May 9, 2013) (criticizing Bormuth for “injecting] into the record venomous, irrelevant, and gratuitous commentary”).[12] The Commissioners did react poorly to Bormuth’s actions. Context shows, however, that they reacted not to his beliefs but to the litigious way he chose to express them. Indeed, the comments quoted above came after Bormuth had brought yet another lawsuit. The Establishment Clause might prevent government officials from making a practice of “singling] out dissidents for opprobrium,” Town of Greece, 134 S.Ct. at 1826 (Kennedy, J.), but it does not require them to keep their cool. This point separates this case from Lund, where the Fourth Circuit found “[m]ulti-ple” examples of prayers portraying non-Christians as “spiritually] defective]” and “suggesting that other faiths are inferior.” 863 F.3d at 284-85. No such practice of opprobrium has been alleged here, let alone shown.
That leaves us with Bormuth’s final coercion claim that Jackson County allocated benefits and burdens due to Bor-muth’s' objection to its prayer practice by not appointing him to the Solid Waste Planning Committee or the Board of Public Works. Assuming appointments to local citizen advisory boards rises to the level of “allocating benefits and burdens” under Town of Greece, and including those facts set forth in Bormuth’s second motion to supplement that the district court denied, we do not agree.[13]
*519 Beyond a template rejection letter, we know nothing about why Jackson County rejected Bormuth’s application to fill a vacancy on the Solid Waste Planning Committee. All we have are unverified assertions from his complaint that he “believes he was excluded deliberately in retaliation for his Pagan religious beliefs, his hostility to an established Christian religion, and his filing of this lawsuit in Federal Court.” But in order to defeat Jackson County’s motion for summary judgment, Bormuth was required to go “beyond the pleadings” and “do more than simply show that there is some metaphysical doubt as to material facts to survive summary judgment.” Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., 598 F.3d 257, 270 (6th Cir. 2010) (citation omitted). Bormuth failed to put forth any evidence tying his objection to the invocations to the Board’s decision to not appoint him to the Solid Waste Planning Committee, and we therefore give no weight to this allegation.
We know slightly more with respect to his application for an appointment to the Board of Public Works. Yet, other than Bormuth’s attestation that he was “the most qualified applicant,” there is nothing in the record linking the refusal to appoint Bormuth to the Board of Public Works to his objection to the prayer policy. Bormuth even admits he was told that the candidate selected “was a former township supervisor who was involved with setting up a township recycling station and that his experience with recycling was the focus for his appointment.” Accordingly, there is no record evidence indicating Jackson County “allocated benefits and burdens based on participation in the prayer. ...” Town of Greece, 134 S.Ct. at 1826 (Kennedy, J.).
On this record, Bormuth has not carried his burden to set aside Justice Kennedy’s presumption that reasonable observers know legislative prayer “lend[s] gravity to public proceedings[,] and ... acknowledge[s] the place religion holds in the lives of many private citizens,”, and does not “afford government an opportunity to proselytize or force truant constituents into the pews.” Id. at 1825. At bottom, Bormuth has shown he was offended by the Christian nature of the Board’s prayers. But “[o]ffense ... does not equate to coercion.” Id. at 1826. Jackson County therefore did not “engage in impermissible coercion merely by exposing [Bormuth] to prayer [he] would rather not hear and in which [he] need not participate.” Id. at 1827.
2.
Finally, under Justice Thomas’s legal coercion test, Bormuth’s challenge easily fails. In fact, he makes no such argument to the contrary. Bormuth only raises “subtle coercive pressures” which do not remotely approach “actual legal coercion.” Id. at 1838 (Thomas, J., concurring in part and in the judgment).
C.
In sum, Jackson County’s invocation practice is consistent with Marsh v. Chambers and Town of Greece v. Galloway and does not violate the Establishment Clause.
V.
For these reasons, we affirm the judgment of the district court.

. We note that even if we were to consider the proffered videos, our disposition would not change.

. Bormuth also, contends the district court erred by not permitting him to supplement the record with respect to the decision by the Board to not appoint him tp a vacancy on the Board of Public Works. We address this claim of error in our text below.

, In our pre-Town of Greece case law, we refused to apply Marsh's historical analysis to prayers offered before public school boards and instead applied Lemon's endorsement test in line with public school prayer cases. See Coles ex rel. Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 379-83 (6th Cir. 1999). Because the issue is not before us, now is not the time to decide whether Coles is still viable post-Jbwn of Greece.

. We recognize our view regarding Jackson County’s invocation practice is in conflict with the Fourth Circuit's recent en banc decision. See Lund v. Rowan Cty., 863 F.3d 268 (4th Cir. 2017) (en banc). However, for the reasons stated in the text of this opinion, and as more fully explained by the dissenting judges in Lund, see id. at 296-300 (Niemeyer, J., dissenting) and id. at 301-323 (Agee, J., dissenting), we find the Fourth Circuit’s majority en banc opinion unpersuasive.

, As but one substantive example, consider the following prayer offered by a delegate to Illinois's Constitutional Convention on January 12, 1870, which is not unlike the many prayers offered by the Jackson County Commissioners:
Almighty God, our Heavenly Father! We recognize Thee as ■ the great Sovereign of the Universe; the Father of our .spirits; the Framer of our bodies; the Author of our life, and.the Giver of every blessing and comfort that makes life desirable. We thank Thee for the kind care’Thou hast exercised over us during the last night. We thank Thee for the blessing of this morning; and we pray Thee, Heavenly Father, that Thy blessing may rest upon us as a Convention, during this day; that we may be wise in our conduct; .that we may have reference to the Divine Glory, and regard for the best inter *510 ests of all who shall be affected by our action, in all we may do. Give us not only a sense of our dependence upon Thee, but give us all necessary wisdom and grace, that we may discharge our duties so that the result shall be conducive to the good of all concerned. We ask in the name of Christ, our Great Redeemer. Amen.
State of Illinois, Debates and Proceedings of the Constitutional Convention of 1869, at 166.

. Bormuth suggests these examples do not show a tradition of legislator-led prayer because some "involve prayers led by legislators who were also ministers” and moves that we take notice of these—and other—alleged historical nuances. We find no appreciable difference between prayers by ordained legislators and those legislators who are not, for both reflect prayers given in a capacity as a legislator. Nonetheless, we grant Bormuth's motion, Dkt. #120, which we view as a response to the historical record submitted by the Amici.

. See Kris Maher, Muslim-Majority City Council Elected in Michigan, WAll St. J., Nov. 9, 2015, http://www.wsj.com/articles/muslim-majority-city-council-elected-in-michigan-1447111581.

. Bormuth also claims the 1797 Treaty of Tripoli forbids Jackson County's practice. We find this argument meritless and follow the Supreme Court’s instruction to focus on whether the practice "fits within the tradition long followed in Congress and the state legislatures.” Town of Greece, 134 S.Ct. at 1819. Unrelatedly, we agree with the district court that Bormuth does not have standing to assert an Establishment Clause violation on behalf of the children who sometimes lead attendees in the Pledge of Allegiance following the prayer. See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 489-90, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

. Writing not for the court, I remain of the view as expressed in my panel dissent that the concurring opinion of Justice Thomas is narrower on the issue of coercion and therefore controlling. The Supreme Court has told us that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds,” Marks, 430 U.S. at 193, 97 S.Ct. 990 (internal quotation marks and citation omitted). Only five justices concurred in Town of Greece. Justices Thomas and Scalia specifically concurred in Justice Kennedy’s tradition analysis, but not in his social-coercion analysis. Instead, Justice Thomas offered a narrow *516 er definition of coercion: that a more limited set of government actions—those backed "by force of law and threat of penalty"—will constitute coercion. Town of Greece, 134 S.Ct. at 1837 (Thomas, J., concurring in part and in the judgment) (quoting Lee v. Weisman, 505 U.S. 577, 640, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting)). As such, Justice Thomas’s opinion is the narrowest and should control. Judges Batchelder and Thapar concur.

. In Lund, the Fourth Circuit concluded . “these options, such as they were, served only to marginalize." 863 F.3d at 288. Even if these options so marginalized attendees, they are options Justice Kennedy's plurality opinion expressly approved. See id. at 320 (Agee, *517 J., dissenting) (citing Town of Greece, 134 S.Ct. at 1827 (Kennedy, J.)).

. See also Bormuth v. City of Jackson, No. 12-11235, 2012 WL 5493599 (E.D. Mich. Nov. 13, 2012); Bormuth v. Dahlem Conservancy, 837 F.Supp.2d 667 (E.D. Mich. 2011); cf. In re: Peter Carl Bormuth, No. 13-1194 (6th Cir. April 23, 2013); Bormuth v. Johnson, No. 16-13166, 2017 WL 82977 (E.D. Mich. Jan. 10, 2017); Bormuth v. Grand River Envtl. Action Team, No. 321885, 2015 WL 6439007 (Mich. Ct. App. Oct. 22, 2015).

. Because we assume those facts not accepted by the district court, the alleged error, if *519 any, in denying Bormuth’s second motion to supplement was harmless.